[Civ. No. 12779. Second Appellate District, Division Two.—January 24, 1941.]

GENERAL PETROLEUM CORPORATION OF CALIFORNIA (a Corporation), Respondent, v. CITY OF LOS ANGELES et al., Appellants.

Ray L. Chesebro, City Attorney, Frederick von Schrader, Assistant City Attorney, and Wm. Christensen, Deputy City Attorney, for Appellants.

Martin J. Weil and J. M. Jessen for Respondent.

WOOD, J.—Plaintiff obtained a judgment against defendants as compensation for damage to its wharves caused by the Japanese Steamship *Hakonesan Maru* which was being brought to the wharves by defendant Oliegreen, a pilot in the employ of defendant city. It is charged that the pilot was negligent in docking the vessel. On a former appeal, taken by plaintiff from a judgment after a ruling that the complaint failed to state a cause of action against defendant city (22 Cal. App. (2d) 332 [70 Pac. (2d) 998, 72 Pac. (2d) 551]), it was held that the city was engaged in a proprietary function at the time of the accident and is liable for the negligence of its agent, the pilot Oliegreen. After the *remittitur* went down the action was tried and the court found that the damage was caused by the negligence of the pilot. It is now contended on behalf of defendants that this finding is not supported by the evidence and that the damage was caused by an unavoidable accident brought about by a sudden gust of wind.

The vessel struck the wharves on the afternoon of May 21, 1932, between 5:30 and 6:00 o'clock. As the vessel entered the harbor the tugboat *John Stuart* was tied to her bow and the pilot prepared to take her to plaintiff's wharves. The witness Foley, chemist in plaintiff's employ, testified that he saw the *Hakonesan Maru* as she approached plaintiff's wharves and that her bow was angled into the wharves when she was only 20 feet away. The witness McKinney, a dockman, testified that as the vessel proceeded up the channel she was about 115 feet distant from the wharves. A number of witnesses testified that the weather had been windy and squally all the afternoon. The witness Foley and the witness Brown, a dockman, testified that they did not

notice a gust of wind of any great intensity immediately before the accident. From the chart of the United States Weather Bureau it appeared that from 3 P. M. to 7 P. M. on the date in question the wind was blowing between 24 and 30 miles per hour and between 5 P. M. and 6 P. M. it varied between a low of 25 and a high of 32 miles per hour. The chief of the weather bureau testified that a wind blowing from 25 to 30 miles per hour at Los Angeles harbor would be "somewhat gusty" and that the gusts would vary "considerably" from the average velocity. Captain Gilbert, port captain for defendant city, in answer to the question, "How do you bring boats into the General Petroleum docks when it is blowing a good breeze", answered, "I employ two tugs, each with a tow line, one at the bow of the vessel the other at the stern . . . ".

The record discloses that Captain Stofen, an expert called by defendants, testified in part: "The Court: Well, what I mean to say, with a ship like this Japanese ship; it was from 30 to 50 feet in places out of the water possibly; light; a lot of freeboard; how far off would you feel it was safe to be from the lee shore? A. Well, if I were coming in under those conditions, I would certainly want to stand off close to mid-channel, or about mid-channel. The Court: That would give you approximately 500 feet? A. Yes; that is, in approaching the dock." The witness further testified: "Q. Yes; that you saw at that point that ships were coming down the harbor, that were crowding you over closer than you wanted to be, would you still try to make a landing at the docks? A. If I felt that they were going to crowd me too close, no; I would increase the speed of my ship then and try and pass the dock; that is, if I could see that far ahead. Q. And then you would go up to the turning basin, would you? A. Yes. Q. And come out and try over again when you were not crowded? A. Presuming it did not make any difference which side the ship had to go to. Q. But if it did make any difference which side, you could go to the turning basin and then out into the outer harbor, and come up when things were less crowded? A. Yes, try it again."

The vessel was lightly laden and an unusually large part of it extended above the water. Captain Oliegreen testified that as he approached the neighborhood of plaintiff's wharves he met two steamships, the *Point San Pablo* and the *Admiral Senn*, which were coming out of the harbor on

a mid-channel course and that he was compelled to bear over in order to pass them. He testified: "Q. And if there is a cross-channel wind, isn't it sometimes a little more difficult to dock at those docks than at other docks? A. Yes, it is. Q. For that reason isn't it true that the usual practice of masters and pilots in coming up to the dock, is to stay a considerable distance off the docks, and then bring their ship to a standstill and allow her to drift over under the pressure of the wind? A. That just depends on the conditions, if you have a fresh wind, or something like that. Q. Well, if it is blowing as hard as 28 miles per hour, we will say. A. Oh, yes. . . . Q. Now, on this particular day, if you had not met the *Point San Pablo* and the *Admiral Senn,* do I understand that you would have stayed further off the dock? A. I would, yes. Q. About how far? A. Well, I would have stayed at least mid-channel until I got up to 239. Q. That is about four to five hundred feet off; is that correct? A. Yes, about 400 feet off. Q. Because that was the safest procedure to follow; is that right? A. Yes. . . . Q. If it had not been for the one or more ships approaching from the other direction, would you have kept farther out in the channel? A. I would have kept mid-channel. I was forced to the right. Q. Now, by 'farther out in the channel,' you were referring there to what you have now drawn as the dashed line on this Exhibit A? A. Yes, that is correct; that is all right. Q. And in your opinion at that time, that was the preferable course to follow, wasn't it? A. Yes, I guess so. Q. And when you saw that you could not follow that course, you still tried to make the landing, didn't you? A. Yes."

Captain Oliegreen further testified that as he approached the wharves a sudden gust of wind of a velocity of 40 to 50 miles per hour threw the vessel against the landing; that when the squall hit the ship he gave the order "full speed ahead" to try to get away from the wharves; that when the ship did not answer her helm he gave the order to "reverse at full speed" and drop the port anchor; that if he had gone forward past the wharves he would have landed the ship in a rock pile which might have caused damage of about $150,-000. Several expert witnesses testified on behalf of defendants that Captain Oliegreen had acted properly at the time the squall struck the vessel.

A pilot is required to use the ordinary care of an expert in his profession. He must exercise the degree of skill commonly possessed by others in the same employment and, although he is not liable for mere errors of judgment he is liable for damage caused by his failure to exercise the diligence which others similarly situated would ordinarily have exercised. (*The Dora Allison,* 213 Fed. 645.) Pilots are liable if they handle vessels in a manner which nautical experience and good seamanship would condemn as unjustifiable at the time. (*The Clarence L. Blakeslee,* 243 Fed. 365 [156 C. C. A. 145].)

When a moving vessel strikes a stationary object, such as a wharf, an inference of negligence arises and the burden is then upon the owners of the vessel to rebut the inference of negligence. (24 R. C. L. 1270; *The Louisiana,* 70 U. S. (3 Wall. 164) 672 [18 L. Ed. 85]; *The Marian,* 66 Fed. (2d) 354.) The trial court may make findings based upon an inference or a presumption. (*Barsha* v. *Metro-Goldwyn-Mayer,* 32 Cal. App. (2d) 556 [90 Pac. (2d) 371]; *Westberg* v. *Willde,* 14 Cal. (2d) 360, 365 [94 Pac. (2d) 590].) Such a finding will not be disturbed on appeal unless it appears frrom all the evidence that the inference, or presumption as the case may be, is wholly irreconcilable with the evidence. The record before us discloses that the inference of negligence is consistent with the evidence and that the court's finding of negligence on the part of the pilot is sufficiently supported. It will be noted that there is a conflict in the testimony on the point of the strength of the gust of wind at the time the vessel struck the wharf. Three of the witnesses testified in effect that at that moment the wind was not of great violence. There is also a conflict in the testimony as to the distance between the *Hakonosan Maru* and the wharves as the vessel advanced. From the testimony of one expert it appears that in view of the weather conditions two tugboats should have been used instead of one. Even Captain Oliegreen himself testified that the preferable course would have been to ''keep mid-channel'' and that when he could not do so he ''still tried to make the landing''. The trial court could reasonably conclude from the evidence that good seamanship would have required the pilot to proceed to the turning basin and after making the turn to make another attempt to approach the wharves when

the middle part of the channel was not occupied by outgoing vessels.

The judgment is affirmed.

Moore, P. J., and McComb, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied March 24, 1941.