SOCIEDAD DE TRANSPORTES MARITIMOS, S.A., Libelant,

v.

The PANAMA CANAL COMPANY, Respondent.

NOZAKI AND COMPANY, Ltd., Libelant,

v.

The PANAMA CANAL COMPANY, Respondent.

Nos. 3553, 3555.

District Court, Canal Zone, Division Balboa.

June 30, 1958.

Charles E. Ramirez and Woodrow de Castro, Balboa, Canal Zone, proctors for libelants.

Messrs. David J. Markun, Balboa Heights, Canal Zone and Theodore P. Daly, Ancon, Canal Zone of the General Counsel's Office, The Panama Canal Co., proctors for respondent.

CROWE, District Judge.

These are two actions in admiralty arising out of libels in personam filed by Sociedad de Transportes Maritimos, S. A., a Panamanian corporation as owner of the S.S. Aurora Borealis, a vessel of Panama registry, and Nozaki and Company, Ltd., a limited company domiciled in Tokyo, Japan, as consignee and owner of a cargo of coal on board the S.S. Aurora Borealis, against the respondent, The Panama Canal Company. As the two cases arise out of the same vessel accident it was stipulated between the parties that they be consolidated for trial

and that the issue of liability, common to both of the cases, be tried separately and prior to the issue of the extent of damages and thus the Court limits itself in this decision.

Libelant, Sociedad de Transportes, alleges that on July 20, 1951, the respondent, a corporate agency and instrumentality of the Government of the United States of America, after having been paid the required tolls, assigned a Probationary Panama Canal Pilot, an employee of respondent, to pilot the Aurora Borealis through the Panama Canal from the Atlantic entrance to the Pacific entrance.

It alleges that the transit began about 9:00 a. m. with the said pilot "in charge of the navigation and maneuvers" of the vessel and that at about 3:50 p. m. the tugboat San Pablo, property of the respondent, after being ordered by the pilot started towing the ship from a point known as Chagres Crossing through the Gaillard Cut, a narrow part of the Canal.

The libelant alleges further that due to the incompetence of the pilot, his negligence and improper management and navigation of the Aurora and his improper control and direction of the tug the vessel was caused to veer and strike the east bank of the Canal causing serious damage to the ship in the amount of $125,000.

The libelant alleges further that after striking the east bank the respondent's pilot knowing the ship to be unseaworthy and unmanageable by reason of much water entering the forward section requested an additional tug from respondent but before the second tug arrived he attempted to transit the Gaillard Cut with the original single tug and after going some 3,000 feet from the point of original impact the ship struck the west bank of the Canal by reason of the negligence and incompetence of respondent's pilot and thereby sustained additional heavy damages.

The respondent in its answer admits the vessel struck the banks of the Panama Canal but denies generally all allegations as to negligence on the part of the respondent or negligence or incompetence on the part of its agents or employees and pleads specially that the injuries sustained by the S.S. Aurora Borealis were proximately caused by the negligence or fault of the vessel and/or its master, officers or crew in that

(a) The vessel was generally unwieldy and unmaneuverable by virtue of its design, age, general condition, engine power, the extent to which it was loaded, etc.

(b) The vessel had very low backing power.

(c) The vessel was very slow to respond to the rudder.

(d) The pilot could not place complete reliance upon the engineering officers or crew in that he had received a wrong bell response during the transiting of the Canal.

(e) After the striking of the east bank and before the striking of the west bank the emotional condition of the master and other officers was such that it was difficult for the pilot to make his orders understood and to get them carried out.

The Nozaki and Company, Ltd., in its libel against respondent claims a loss to its cargo of coal on board the vessel and that by reason of its contract of carriage it was required to post a General Average sum of $34,006.61 which has not been repaid.

The respondent denies this claim generally and also sets up the defense of the defects in the vessel as alleged in its answer to the libel of Sociedad de Transportes Maritimos, S.A.

### Findings of Fact

1. The respondent, Panama Canal Company, was at all times mentioned in the libel and still is a corporate agency and instrumentality of the Government of the United States of America created by Act of Congress of June 29, 1948 (c. 706; sec. 2, 62 Stat. 1076; consisting of secs. 245 to 258 title 2, Canal Zone Code), as amended by the Act of September 26,

1950 (c. 1049, sec. 5 et seq., 64 Stat. 1041.)

2. At all times mentioned in the libel in Case No. 3553, the libelant, Sociedad de Transportes Maritimos, S.A., was and now is a corporation organized and existing under and by virtue of the laws of the Republic of Panama, and was at all times alleged in the libel the owner of the S.S. Aurora Borealis, a vessel of Panama registry, of 5,114 gross tons, 3,102 net tons, 401 feet overall length, and which, prior to striking the banks of the Panama Canal, on the 20th day of July, 1951, was tight, staunch and strong and in all respects seaworthy and properly manned, officered, equipped and supplied.

3. At all times alleged in the libel in Case No. 3555, the libelant, Nozaki and Company, Ltd., was and now is a limited company domiciled at Tokyo, Japan, and was at the time of the injury alleged in the libel the consignee and owner of a cargo of coal on board the S.S. Aurora Borealis which was chartered to Hans Tobeason, Inc., to carry the aforesaid cargo from "Norfolk and/or Newport News to a port in Japan."

4. The S.S. Aurora Borealis arrived at the Port of Cristobal, Canal Zone, and paid the required toll and upon request was authorized by the respondent to transit the Panama Canal from its Atlantic Terminal to its Pacific Terminal.

5. In accordance with the President's Executive Order No. 4314 of September 25, 1925, governing the transits of ships through the Panama Canal a pilot was placed on board in control of the navigation and movement of the vessel during the transit.

6. The pilot placed on the vessel was Julius F. Dietz, Pilot, Probationary, the possessor of a Master's License in the U. S. Merchant Marine issued in 1944. He was fully qualified by reason of training and license to pilot vessels of not more than 420 feet through the Canal and the S.S. Aurora Borealis was only 401 feet in overall length.

7. The S.S. Aurora Borealis was a "Hog Islander," a ship of a particular type of construction that is well known among pilots to be sluggish, slow handling and slow to respond to the rudder.

She was a right-handed single screw, steam turbine cargo vessel of approximately 5,000 gross tons, 3,100 net tons, 401 feet overall length and a beam of 54.2 feet. Her draft was 25 feet 2 inches forward and 25 feet 8 inches aft. She had neither rudder angle indicator nor engine revolution indicator on the bridge. The vessel had no list and was nearly fully laden.

8. The pilot boarded the ship at Cristobal on July 20, 1951, at 9 a.m. and the transit began at 9:15 a.m. The pilot noticed that she was sluggish and on her approach to Gatun Locks at the west entrance she sheered to port and the pilot found that she responded in such a sluggish manner to the rudder that it was necessary to back the engine full and drop the starboard anchor to keep her under control.

Some trouble was experienced in the locks by reason of a wrong response on the part of the engine room to the pilot's order of full astern but this was overcome and nothing developed that was related in any way to the striking of the bank that occurred later, except that the pilot's confidence in the cooperation from the engine room was shaken.

9. After leaving Gatun Locks and during the transit across Gatun Lake the vessel responded correctly to the helm but continued sluggish and required much more rudder than normally used on vessels of this type.

10. By reason of the "sluggishness of the ship, the excessive amounts of rudder needed and the incorrect answering of the engine movements" the pilot decided after a conference with the master to use a tug to assist the vessel in passing through Gaillard Cut.

11. In accordance with the pilot's request for a tug the respondent assigned its tug San Pablo, under the command of

Captain Wesley Anderson, to assist the Aurora Borealis through the Cut.

12. Captain Wesley Anderson was a man with many years of sea experience with a license as a mate dating from 1933. He became a tugboat master in February 1941 and resigned in 1943 to go into the Armed Forces. In January 1946 he was re-employed by the Panama Canal (respondent's predecessor) where he continued to serve until respondent was created by Congress, whereupon he became respondent's employee and continued to serve as tug master until and after the accident complained of in this action.

13. The tug San Pablo was a craft commonly used by the respondent for towing and assisting vessels through the Canal. She was about 123 feet long, 30 foot beam, 323 gross tons, and was propelled by a diesel electric engine of one thousand horsepower with a maximum speed of 11 knots.

14. The respondent had at least two other similar tugs, the Culebra and the Gatun, and Captain Anderson had served as tug master on both of them.

15. The Aurora Borealis was met by the tug San Pablo near the Chagres Crossing and a hawser from the tug was made fast to the Aurora through her port bow chock. The hawser length was approximately 200 feet, which is the customary length used in towing vessels through the Panama Canal.

At the time of beginning the tow the engines of the Aurora were stopped and she was making not more than 3 knots headway. While getting the hawser aboard the ship was held on the range by the pilot through the use of the rudder but the tug kept veering to port which made it impossible to hold the ship steady.

The ship veered to port and it was necessary for the pilot to back the ship full in order to break the sheer to port caused by the tug.

As anticipated by the pilot on recovering from the sheer to port the ship sheered to the right.

The tug appeared to be in "irons" to the pilot, a condition dangerous to both vessels. This was denied by the tug master who said that the condition never existed.

The speed of the vessel had been reduced by the backing of the engines to about 2½ knots but the pilot could not back the engines again as the bow was approaching "a dangerous angle with the west bank."

The pilot called by radio for a second tug for at that time he felt that the tug on the hawser ahead would not be sufficient to make the La Pita turn safely but he had to continue ahead before the second tug arrived to keep from landing parallel on the bank.

The vessel recovered from the sheer to the right and the pilot endeavored by radio and visual signals to order the tug to the starboard bow to hold the bow of the Aurora in the center of the channel but the tug did not respond and the tug master told the pilot to let the ship alone and they would get along all right in the Cut.

The vessel did not recover from the last sheer to port although the pilot dropped the starboard anchor and backed the engines full. The Aurora struck the east bank of the Canal and although the pilot called to the tug San Pablo to stop immediately, he received no response, the tug kept going ahead and the pilot found it necessary to come ahead on the engine with a hard left rudder to prevent "further damage."

16. The tug's continued pulling on the bow made it impossible for the pilot to stop the ship and he ordered the tug across the bow to break another sheer to starboard.

The vessel was yawing from side to side and the tug crossed and re-crossed the bow in vain attempts to break the sheer, but in spite of this activity and

the maneuvers of the engines and rudder under the direction of the pilot the ship struck the west bank.

17. The second tug, Chagres, came alongside and fastened to the port quarter of the Aurora near Las Cascadas junction and thereafter they proceeded to Pedro Miguel without further mishap.

18. All orders to the helm were obeyed properly and promptly, and all orders to the engines just prior to the accidents and during the maneuvers to attempt to avoid striking the banks were obeyed properly and promptly. The pilot had no criticism to offer of the way in which the crew performed its duties.

19. The striking took place at 4:10 p.m. on a day when the wind was negligible and the visibility was good. The bank struck was formed of rock and the channel at the point of striking was about 300 feet in width and 47 feet deep.

20. The striking was due to the lack of coordination and cooperation between the respondent's pilot and tug master in attempting to maneuver the ship through Gaillard Cut.

21. The ship was slow to respond to her rudder but the pilot had ample time to test her in her transit of the Canal prior to reaching the Cut, and if more than one tug was needed to execute the transit of the Cut successfully he should have made the necessary orders.

## Conclusions of Law

1. The Court, in admiralty, has jurisdiction of the parties and the subject matter of the action.

■ 2. During the trial of the action the Court reserved its opinion on the admissibility of a transcript of the record of an investigation conducted by the Board of Local Inspectors of the Canal Zone Government. The libelant's proctors especially attacked the Findings of Fact and Opinion of the Board as being inadmissible.

The Court does not agree with proctors for the libelant but is of the opinion that the record, findings, and opinion of the Board is a record required by law to be kept and that it was made in the regular course of business and is in the nature of a public document and admissible in evidence as an exception to the hearsay rule. See The Abangarez, D.C., 60 F.2d 543; see 28 U.S.C. sec. 1732; Wigmore on Evidence (3rd Edition) Vol. 5 sec. 1673 page 703.

In the case at bar the argument for admissibility is even more persuasive than in other cases of board hearings by reason of the prerequisite imposed upon persons seeking redress from the Panama Canal Company by Section 10(g) of Title 2 of the Canal Zone Code demanding that an investigation be made by the Board before suit can be filed.

■ 3. The rule relative to a pilot is that he must exercise the degree of skill commonly possessed by others in the same employment and although he is not liable for mere errors of judgment he is liable for damage caused by his failure to exercise the diligence which others similarly situated would ordinarily have exercised. See The Dora Allison, D.C., 213 F. 645; General Petroleum Corp. of Calif. v. City of Los Angeles, 42 Cal.App.2d 591, 109 P.2d 754.

■ In this case the errors causing the collisions cannot be said to fall into the category of mere errors of judgment. There was nothing unusual, such as a storm or other unexpected hazard, that demanded summary judgment or sudden decision on the part of the pilot in charge of the Aurora. The long transit from 9:15 a. m., when the pilot boarded the vessel, to 4:10 p. m., the time of the strikings, gave him ample opportunity to exercise the high degree of nautical skill demanded and determine if the ship were capable of passing through the Cut with only one tug or if her steering equipment was so sluggish that she be made a "dead" ship and an additional tug lashed to her quarter for steering and assisting in her propulsion.

The pilot chose to negotiate the Cut with only one tug. The failure of the

ship to make a safe transit and its striking of the bank, a stationary object, created an inference of negligence which was not rebutted by the evidence.

The evidence is that ships that cannot even be steered at all because their engines are stopped ("dead" ships in local parlance) can be transited successfully by the use of two tugs, one towing on the bow and one lashed to the quarter.

In the absence of showing some failure of the crew, unexpected defect in the ship, or natural hazard that could not have been anticipated, the failure to use two tugs with the Aurora was a failure to exercise the necessary skill in handling her and was negligence on the part of the pilot. See General Petroleum of Calif. v. City of Los Angeles, supra; Sanders v. Meyestein, D.C., 124 F.Supp. 77; The Marian, 9 Cir., 66 F.2d 354; The Severance, 4 Cir., 152 F.2d 916; The Anaconda, 4 Cir., 164 F.2d 224.

4. In addition the pilot testified that at critical moments in the transit through the Cut and at moments just prior to the first striking and immediately thereafter he received no "response" from his commands to the tug. Such a failure to respond on the part of the respondent's agents and employees in charge of and operating the tug was negligence. The pilot was in charge of the complete operation and the failure of the respondent's tug to cooperate and obey the pilot's commands contributed to and was the proximate cause of the collisions.

5. The pilot and the tug master were both employees of the respondent engaged in duties within the scope of their employment and respondent, The Panama Canal Company, is liable for any damage accruing to libelants by reason of their negligence.

6. The proctors for libelants are directed to prepare an order in accordance with these findings and the case will again be placed on the docket for setting subsequent hearings for the determination of damages due.