**PANAMA CANAL COMPANY,**
Appellant,

v.

**SOCIEDAD DE TRANSPORTES MARITIMOS, S.A., et al., Appellees.**

No. 17465.

United States Court of Appeals
Fifth Circuit.

Nov. 30, 1959.

David J. Markun, Balboa Heights, Canal Zone, Paul A. Bentz, Gen. Counsel, Balboa Heights, Canal Zone, Theodore P. Daly, New York City, for appellant.

Edwin Longcope, New York City, Charles E. Ramirez, Balboa, Canal Zone, Hill, Betts & Nash, New York City, Van Siclen & Ramirez, Woodrow de Castro, Balboa, Canal Zone, for libellants-appellees, Edward A. Neiley, Washington, D. C., of counsel.

Before RIVES, JONES and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

In this case, as in Victorias Milling Company v. Panama Canal Company, 5 Cir., 272 F.2d 716, a ship going through the Panama Canal and in the charge of a pilot employed by the Panama Canal Company, struck the banks of the Canal. In both cases the libelants contended that the doctrine of res ipsa loquitur applies to allisions in the Canal when the ship is under compulsory pilotage. For the reasons given in Victorias Milling Company v. Panama Canal Company, we hold that the doctrine is not applicable in the instant case. We agree with the district court, however, that in this case the negligent acts of the pilot and of a tugmaster, both employees of the Canal Company, were the proximate cause of the accident.

Two libels were filed, one by Sociedad De Transportes Maritimos, owner of the damaged ship, S.S. Aurora Borealis, and the other by Nozaki Company, owner and consignee of damaged cargo. The parties stipulated that the two cases be consolidated for trial and that the issue of liability, common to both cases, be tried separately and before the trial of the issue of damages.

The respondent, Panama Canal Company, is a corporate agency and instrumentality of the United States.[1] Its primary function is to maintain and operate the Panama Canal. The company is liable for injuries to vessels or cargo caused by the negligence or fault of its officers or employees acting within the scope of their employment.[2] An ex-

---

1. The Panama Canal Company was created by Act of Congress of June 29, 1948 (c. 706, sec. 2, 62 Stat. 1076; consisting of secs. 245 to 256 title 2, Canal Zone Code), as amended by the Act of September 26, 1950 (c. 1049, sec. 5 et seq., 64 Stat. 1041).

2. "(b) Injuries Other Than in Locks.—The Panama Canal Company shall promptly adjust and pay damages for injuries to vessels, or to the cargo, crew, or passengers of vessels which may arise by reason of the presence of such vessels in the waters of the Canal Zone, other than the locks, when the injury was proximately caused by negligence or fault on the part of any officer or employee of the corporation acting within the scope of his employment and in the line of his duties in connection with the operation of the canal: Provided, however, That in any case wherein the negligence or fault

ecutive order requires compulsory pilotage through the Panama Canal. 35 CFR § 4.22 (1949). "The pilot assigned to a vessel shall have control of the navigation and movement of the vessel." 35 CFR § 4.27 (1949). Vessels without motive power, disabled vessels, and vessels that steer badly or that are liable to become unmanageable for any reason must be towed through the Canal. 35 CFR § 4.85 (1949).

July 20, 1951, the S.S. Aurora Borealis, a cargo vessel of 5,000 gross tons and 401 feet overall length, began a southbound transit of the Canal.[3] The vessel was powered by a 2500 h.p. steam turbine engine with a right-handed single screw. It was not equipped with a rudder-angle indicator nor an engine-revolution indicator. The Aurora Borealis is a "Hog Islander". Pilots know these ships to be sluggish, slow handling, and slow to respond to the rudder.

Captain Julian Dietz, a probationary pilot,[4] boarded the Aurora Borealis at 9:15 A.M. to take the ship through the Canal. He soon realized that the ship was sluggish. After leaving the dock of Christobal and before entering Gatun Locks, he observed that the vessel did not respond properly to his order.[5] Consequently, he requested a tug to assist the vessel through the Gaillard Cut, a narrow part of the Canal.

The tug San Pablo met the Aurora Borealis near the Chagres crossing. The engines of the Aurora were stopped for several minutes while a single towing hawser was attached to the tug. The Aurora was then not making over three knots headway—bare steerageway. The Aurora sheered off course while the hawser was being made fast.[6] As the vessel proceeded under tow, at a hawser length of approximately 200 feet, the customary length used in towing vessels through the Canal, it veered to port. The pilot corrected this port sheer by ordering the vessel's engines full astern. The vessel then sheered to starboard. To the

of the vessel, master, crew, or passengers proximately contributed to the injury, the award of damages shall be diminished in proportion to the negligence or fault attributable to the said vessel, master, crew, or passengers: And provided further, That in the case of any vessel which is required by or pursuant to regulations prescribed under section 9 of this title, as amended, to have a Panama Canal pilot on duty aboard, no damages shall be adjusted and paid for injuries to any vessel, or to the cargo, crew, or passengers of any such vessel, incurred while the vessel was under way and in motion, unless at the time such injuries were incurred the navigation or movement of the vessel was under the control of a Panama Canal pilot." 2 Canal Zone Code, § 10(b), as amended by the Act of September 26, 1950, § 3.

3. For a more complete statement of facts see the district judge's findings of fact in Sociedad De Transportes Maritimos v. Panama Canal Co., D.C.Canal Zone, 1958, 163 F.Supp. 151.

4. Pilot Dietz had sea experience dating back to 1938. His unlimited Master's License was issued in 1944. He had transited the Canal thirty times in the capacity of Second Officer. He joined the Panama Canal Company as a Pilot-In-Training in October 1950. At the conclusion of the Pilot-In-Training period, he passed the Panama Canal Company's final examination and became a Probationary Pilot on April 15, 1951. During the probationary period, new pilots are assigned to ships according to the length of the ships. At the time of the allision Pilot Dietz had been a Probationary Pilot for three months and five days, and was limited to piloting vessels not exceeding 420 feet in length. The Aurora Borealis was 401 feet in overall length.

5. Dietz had to use the starboard anchor and a "full astern" bell to break a sheer to port that occurred while the vessel was approaching Gatun Locks. As the vessel entered Gatun Locks, he gave the order "full astern". Instead, the vessel's speed increased. Pilot Dietz alleged that the engine room personnel responded incorrectly. He checked the quickwater at the stern and concluded that the engines were ahead instead of astern.

6. Dietz testified that the ship fell off to the starboard, but the district judge in his findings of fact stated that the vessel sheered to port while the hawser was being fastened.

pilot the tug appeared to be "in irons", a condition dangerous to both vessels.[7] Alarmed, the pilot called by radio for a second tug. He felt that the single tug would not be sufficient to make the La Pita turn they were approaching, but he was forced to continue ahead in order to prevent the vessel from landing broadside on the west bank. The vessel recovered from the starboard sheer. The pilot then ordered the tug to the starboard bow to prevent a port sheer and to hold the vessel in the center of the channel. The tug did not respond to this order. The tug master told the pilot to "let the ship alone and they would get through the Cut all right".[8] The vessel's sheer to port could not be stopped although the pilot dropped the starboard anchor and backed the engines full. The ship struck the east bank. Pilot Dietz ordered the San Pablo to stop towing immediately. The tug continued to tow, however, and the pilot found it necessary to come ahead on the engine with a hard left rudder in order to prevent further damage. The tug's continued pulling on the bow made it impossible for the pilot to stop the ship. The ship came off the bank and he ordered the tug across the bow to break a sheer to starboard. The ship continued down the Cut. It was "down by the head" and yawing from side to side. In vain attempts to break the sheer, the San Pablo crossed and recrossed the bow of the Aurora Borealis. Despite these attempts, the ship struck the west bank. Somewhat later a second tug came alongside and fastened to the port quarter of the vessel. The Aurora Borealis then proceeded through the Canal without further mishap.

The district court found (1) that the pilot was negligent in not using two tugs and (2) that the failure of the tug master to cooperate with the pilot and to obey the pilot's commands contributed to and was the proximate cause of the accident.

The Canal Company argues that finding negligence in the pilot's decision to use a single tug is second-guessing—a mere error of judgment. In a sense it is. But if the error was so bad that Pilot Dietz failed to exercise the degree of skill and competency prudent pilots generally would exercise in the circumstances of this case, Pilot Dietz' mistake is not cured by calling it an "error of judgment". There is an occupational standard of skill for Panama Canal pilots as well as for doctors and dentists. General Petroleum Corp. of Calif. v. City of Los Angeles, 1941, 42 Cal.App.2d 591, 109 P.2d 754, 1941 AMC 510; The Dora Alison, D.C.Ala.1914, 213 F. 645; 48 Am.Jur. Shipping, § 194, p. 134; 2 Rest. Torts § 249; 2 Harper and James, Law of Torts, § 16.6, p. 917; Prosser on Torts, p. 236.

Here, Dietz testified that he had prepared himself for a hard day because he knew about Hog Islanders. He testified that before the Aurora reached Gatun Locks he noted the ship's sluggishness, the excessive amount of rudder needed, and the incorrect responses to his orders. He did nothing about securing tug assistance until the Aurora was in Gatun Locks. He asked for one tug. Instead of tying up the vessel to await the tug, he attempted to have the tug tie up to the Aurora while the ship was still in motion. When the tug arrived, it was placed ahead of the ship on a hawser. Two former Canal pilots testified as to the placement of the tug. One would have placed the tug on the port bow and the other on the port quarter, but both would have required the tug to be placed on a quarter for the transit of the Canal with the Aurora as a live ship. Two pilots then employed by the Canal Company also testified. One pilot testified

---

**7.** The tug master denied that this condition ever existed.

**8.** The tug master testified that he stopped his engines momentarily, but seeing that the ship had not stopped when it struck the bank and that the stern was about to ground on the jagged rocks, he came full ahead to draw the vessel away from the bank.

that he would have placed the assisting tug ahead on a 200-300 foot hawser, but he agreed that if the vessel were taken through as a dead ship, two tugs should be used, one lashed up to a quarter. The other pilot testified that after the vessel struck the east bank he would have brought her to a stop at the first opportunity and sent for another tug. The evidence is clear that with two tugs the Aurora could have been taken through the Canal as a dead ship without any difficulty.

The striking took place at 4:10 p. m. on a day when the wind was negligible and the visibility was good. The bank struck was a rock bank. At that point the channel was about 300 feet wide and 47 feet deep.

This is not a case where there was one sudden, uncontrollable, unexpected sheer that forced the vessel into the bank. The whole transit of the Aurora through the Cut consisted of sheering, correcting a sheer, and then sheering the other way. While the tug was being made fast to the Aurora, it veered off course. While being towed, the Aurora veered first to port and then to starboard before the final port veer that caused it to strike the east bank. Long before the accident, this erratic course should have made it clear to a reasonably prudent pilot that he could not control the Aurora with a single tug. The sluggishness of the ship and its non-responsiveness to its rudder made bad matters worse. In People of State of California v. The Jules Fribourg, D.C.N.D.Cal.1956, 140 F.Supp. 333, 337, a tug boat captain, who boarded a vessel to act as pilot in docking the vessel in San Francisco, underestimated the strength of the tide and rammed the pier. The court, finding him negligent in not using two tugs, stated: "But, Captain Markley must have been aware that the tide was sufficiently strong that a second tug *might be needed* even though he was reasonably confident that one would suffice. Under these circumstances a prudent pilot would have had a second tug standing by."

The trial judge found that the lack of cooperation between the pilot and the tug master was a proximate cause of the accident. In his deposition for trial purposes, the pilot stated that he did "not feel the owner or any member of [the vessel] was not cooperative or negligent of any duties or execution of any of my orders". The only orders that were not properly obeyed were the pilot's commands to the tug master. As the ship was making the veer to the east bank that resulted in the first scraping, the pilot ordered the tug to the starboard bow to hold the vessel in the center of the channel. The tug did not respond, but the tug master told the pilot to "let the ship alone and we would get along through the Cut all right." After the initial scraping, the pilot ordered the tug to stop towing immediately, but the tug kept going ahead. Thus, it is clear that the tug did not respond to the pilot's orders on at least two occasions. The respondents argue that the most that can be said of these two occasions is that on one occasion the Master countermanded an order from the pilot with a suggestion that was accepted by the pilot, and on the other occasion he failed to acknowledge, but did execute the pilot's order. The lack of cooperation cannot be explained away that easily. At the pilot's first order that the tug cross to the starboard bow and maintain the ship in middle of channel, the master countered with a suggestion that the ship cut its engines and allow the tug to tow the vessel. It seems that at this point both the master and the pilot were in agreement that the vessel should be treated as a "dead ship". This decision however was too late and was unsuccessful in preventing the sheer. The pilot employed the vessel's engines again, but could not prevent the ship from striking the left bank. The confusion, second-guessing, insubordination of the master, and uncertainty of the pilot add up to the lack of care, skill, and special competency expected of a pilot and a tug master entrusted with the safety of a ship.

There is of course considerable evidence in favor of the Panama Canal Company. However, giving the evidence as a whole the construction most favorable to the decree, as this Court is compelled to do, we cannot say that the findings of the trial judge are clearly erroneous. Our review of this case is circumscribed by Rule 52(a), Fed.Rules Civ. Proc. 28 U.S.C.A. McAllister v. United States, 1954, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20; Argentina-Antinous, 5 Cir., 1958, 259 F.2d 11, 1958 AMC 2070.

Judgment is

Affirmed.