**GULF OIL CORPORATION, as Owner, Pro Hac Vice, of the STEAMSHIP GULFSPRAY, Plaintiff,**

**v.**

**PANAMA CANAL COMPANY, Defendant.**

**Civ. No. 6135.**

District Court, Canal Zone, Division Balboa.

April 24, 1970.

Burlingham, Underwood, Wright, White & Lord, New York City, for plaintiff; Joseph C. Smith, New York City, Decastro & Robles, Balboa, Canal Zone, of counsel.

Dwight A. McKabney, Balboa Heights, Canal Zone, for defendant; John L. Haines, Jr., Balboa Heights, Canal Zone, of counsel.

## FINDINGS OF FACT
## AND
## CONCLUSIONS OF LAW

CROWE, District Judge.

### FINDINGS OF FACT

1. At all times material to this action, the plaintiff, Gulf Oil Corporation, was and still is a corporation organized and existing under and by the virtue of the laws of the Commonwealth of Pennsylvania and was at all times alleged in the complaint the owner, pro hac vice, of the Steamship GULFSPRAY, a vessel of the United States of America registry, of 18,776 gross tons, 12,215 net tons, 644 feet overall length, beam 84 feet, built by Bethlehem Steel Company and delivered to her owner in 1960. At the time she arrived at the Port of Cristobal on April 2, 1966 for transit of the Panama Canal she was tight, staunch, and strong, and in all respects seaworthy and properly manned, officered, equipped and supplied.

2. The defendant, Panama Canal Company, is and at all times material to this action was a corporate agency and instrumentality of the Government of the United States of America created by Act of Congress of June 29, 1948 (c. 706, sec. 2, 62 Stat. 1076, as amended by the Act of September 26, 1950 c. 1049, sec. 5, et seq., 64 Stat. 1041) and currently appears as revised and codified by the Act of October 18, 1962 (P. L. 87–845, 76A Stat. 1 et seq.). The charter provisions of the Panama Canal Company are currently contained in 2 CZC, Sections 61 through 75 and 121 through 123, 76A Stat. 8–15, permitting the Panama Canal Company to sue and be sued in its corporate name. One of its business functions is to operate the Panama Canal.

3. On the morning of April 2, 1966, GULFSPRAY arrived at Cristobal for a southbound transit of the Canal, and pursuant to regulations published in 35 CFR 4.22 (now 35 CFR 105.1), two Panama Canal Company pilots were placed aboard by defendant, as is the custom and practice for vessels the size of the GULFSPRAY, and at all times thereafter one or the other was in control of the navigation and movements of the vessel during the transit of the canal and until she anchored in Balboa Harbor in the evening of the same day, as required by 35 CFR 4.27 (now 35 CFR 105.6).

4. The first half control pilot was August J. C. Egle, a master mariner and qualified Panama Canal Company pilot who was relieved by the second half control pilot, Louis Harrell Hixon, similarly qualified, at Chagres Crossing. Captain Hixon had control of the vessel's navigation and movements from there and during the turn from Balboa Reach in the Pacific entrance channel into the Balboa anchorage.

5. GULFSPRAY was last drydocked at Yokohama, Japan, in February 1966, and her underwater body, including her rudder and appurtenant equipment, was examined by her Master, Chief Engineer, and Chief Officer and found to be undamaged and in proper working condition. After leaving the drydock she returned to Port Arthur, Texas, transiting the Panama Canal in March 1966 en route. Loading a part cargo of jet fuel on an MSTS charter, she proceeded from Port Arthur, Texas, to Baton Rouge, Louisiana, where she completed loading her cargo, thence sailed once again for Japan via the Panama Canal, arriving at the Cristobal Bar at 0600, April 2, 1966. There is no evidence that the vessel experienced any difficulty with her steering gear prior to her arrival at Cristobal or at any time until she proceeded outbound in the Pacific channel in the early morning of April 3, 1966, after taking bunkers at Balboa.

6. GULFSPRAY is equipped with a gyrocompass, automatic pilot (original equipment), course recorder with a graph (installed in April 1965) for making a continuous record of the headings and courses steered by the vessel and the time. The vessel may be steered by auto pilot, manually by hand electric steering, or by a separate wheel activating a hydraulic telemotor system. The automatic pilot was used to steer the vessel in the open sea when weather conditions did not require more than 10 degree rudder angle in either direction to maintain the desired course, that being the maximum angle which can be applied automatically. GULFSPRAY was steered by automatic pilot from the Mississippi Delta until one hour before her arrival at the Cristobal Bar on April 2, 1966 when her Master ordered the steering shifted to telemotor, the most reliable system for navigating in restricted waters. Her course recorder graph trace between the Delta and Cristobal was made while the vessel was steered by the automatic pilot.

7. A rudder angle indicator is located on the forward bulkhead of the wheel house immediately to the right of the window customarily used by the person in charge of her navigation. The dial, about 8 inches in diameter, may be illuminated in darkness. It would be readily visible to a person standing in the window to the left and by the wheelsman. It was in good working order on arrival at the Cristobal Bar and continued to show the corresponding rudder angle as ordered by those in charge of her navigation during the transit and until she cleared the Miraflores Locks, proceeding south in the Pacific channel.

8. The transit between Cristobal and the Pacific channel was made without incident. Her course recorder graph shows no unusual movements to indicate a sheer or difficulty in controlling her movements. Captain Forrest, her Master, who remained on the bridge continuously during transit, except for personal necessity, and who has 10 years' experience as Master on GULFSPRAY and two of her sister ships, testified at the trial that the vessel was a good steering ship and that the transit of the canal from Cristobal to Miraflores Locks was without incident. All of her quartermasters, helmsmen, and deck officers testified by deposition in April of 1966, two weeks after the transit, to the same effect. The Ship's Condition Report, a Panama Canal Company form filled out by Captain Egle after the transit showed that her steering was satisfactory during the transit. Neither Captain Egle nor Captain Hixon complained to GULFSPRAY's Master about her steering during the transit. While crossing

Gatun Lake, Captain Egle testified that the vessel required from 5 degrees to 10 degrees of right rudder at various times to maintain a steady course. He mentioned to her quartermaster that the vessel was carrying right wheel, and was advised that the GULFSPRAY always tended to carry right rudder because of her right hand propeller.

9. Leaving Miraflores Locks, Captain Hixon was advised by Balboa Control that it would be necessary to await clearance of two northbound vessels from Balboa Harbor before GULF-SPRAY could obtain a tug for her maneuver from the channel into Balboa anchorage. As GULFSPRAY proceeded slowly southbound in the Balboa Reach with about a one-knot ebb tide underfoot, she was well to her own starboard side of the channel on the southbound sailing line or range to allow the two northbound vessels to swing out of Balboa Harbor into the channel for port-to-port passing.

10. The southbound sailing line in Balboa Reach has a heading of 160 degrees 35 minutes true, is marked by range markers and lights which are visible day and night, and lies 150 feet from, and parallel to, the west prism line of the Canal channel. The northbound sailing line is the reciprocal heading and is located 150 feet from the east prism line of the 500-foot wide reach.

11. When number 26 red buoy was abeam to port, Captain Hixon ordered the wheel hard left and the engines slow ahead (1835 Bridge Bell Book time). Her speed over the bottom was 3 to 4 knots, and at 1835½ (Bridge Bell Book time) her engine was stopped. At 1836½ (Bridge Bell Book time) her engine was ordered full astern and stopped at 1839½ (Bridge Bell Book time). Her heading had changed rapidly from the channel course of 160 degrees to about 120 degrees on the hard left rudder and then abruptly decelerated between 120 and 112 degrees. Her rudder was ordered amidships but the rudder angle indicator did not respond when the wheel was put in the amidship position, being unaccountably stuck at full left rudder for about 30 to 60 seconds before it returned to 0 degrees rudder angle. The engine room was notified, but a check of the steering gear revealed no apparent damage or malfunction.

12. GULFSPRAY's position when the rudder indicator failed to return to the midship (0 degrees) position was established by Captains Egle and Forrest as being north of beacon 21 on a heading between 106–130 degrees. Captain Forrest, standing on the port wing of the bridge at the forward side observed that the northbound sailing line ranges were lined up, which placed GULF-SPRAY's bridge about 350 feet from the west prism line of the channel. The distance from the forward side of the bridge to the after end or trailing edge of the rudder is about 398 feet. At this angle and position GULFSPRAY's rudder was outside the channel in contact with the steep bank immediately contiguous to the 45-foot dredged channel.

13. At about 1839–40 hours (Bridge Bell Book time) GULFSPRAY's rudder was forced, against the west bank outside the Pacific west channel line, north of beacon 21, twisting the rudder stock about 22 inches or 15 degrees to port.

14. No one on the GULFSPRAY, including her two Panama Canal pilots, felt or heard anything that indicated that her rudder contacted the west bank outside the channel, north of beacon 21. Captain Egle testified that rudder indicator failure frequency was high in vessels transiting the Canal and discounted its importance as an indication of a grounding. There was no reason for Captain Forrest, who impressed the Court as being a very prudent and meticulous master, to believe that the vessel struck the bank as she swung from the Balboa Reach of the channel toward Balboa Basin.

15. Captain Hixon's orders to the wheel and to the engine room were promptly and properly carried out by

GULFSPRAY personnel during the maneuvers from the channel into the anchorage. Neither pilot had any criticism of the crew's performance.

16. It is customary for vessels GULFSPRAY's size to wait until tug assistance is available to assist in making the turn. The tug did not arrive until GULFSPRAY was already heading into Balboa Harbor at 1842 hours, after her rudder had been forced against the bank outside the channel.

17. It is the custom and practice of Panama Canal pilots of a southbound vessel the size of GULFSPRAY to gradually work the vessel off the southbound range to the eastward, to ensure a safe distance between the vessel's stern and the west prism line before swinging the vessel into Balboa Basin to avoid allowing the stern to swing out of the channel. It would be an extremely risky maneuver to put the wheel hard left when the vessel is on the southbound sailing line of the channel, starting a rapid swing to the left and then reversing her engine full throttle for three minutes as Captain Hixon did. Two well-qualified Canal pilots, one for plaintiff and one for defendant, were in substantial agreement that they would not have given such orders if they had been piloting the GULFSPRAY on April 2, 1966.

18. There was no immediate danger to GULFSPRAY while she was proceeding southbound in the Balboa Reach and she could have waited until a tug was available before starting the turn into Balboa Basin or eased away from the west prism line and the steep bank to the west of the prism line north of beacon 21 until the vessel was south of beacon 21 (where her pilot thought he was) before making the turn into the basin, using her anchor as a tug to assist in the turn.

19. Captain Hixon failed to exercise the skill in piloting GULFSPRAY that other Panama Canal pilots similarly situated would have exercised.

20. GULFSPRAY's course recorder graph was in operation before she entered Canal Zone waters and it made a continuous record of the vessel's courses and headings as she transited the Canal. The authenticity of the recorder graph was proved on the trial by the comparison of the courses and headings of the Canal reaches and lock headings as shown on H. O. Chart 5000 of the Panama Canal, by the entries in GULFSPRAY's Bridge Bell Book, Deck Log Book, Captain Egle's independent record of the transit, which fixed the position of the vessel at least 21 times during the transit, and Panama Canal Company Operations' Logs for vessel movements.

The course recorder graph established that GULFSPRAY was steered by automatic gyro pilot from her departure from the Mississippi Delta until about one hour before her arrival at the Cristobal Bar in the morning of April 2, 1966, but the automatic gyro pilot could not compensate for the 15 degree twist in the rudder stock after she transited the Canal and departed Canal Zone waters in the morning of April 3, 1966 due to the 10 degree limitation of rudder angle while in automatic steering.

21. A cursory examination of the course recorder graph shows a rapid swing from the 160 degree Pacific channel course at 1833 (recorder time) to about 120 degrees and then an abrupt slowing of the rate of swing between 120 and 112 degrees that cannot be explained by the rudder and engine movements. A careful reading of the course recorder graph on a Gerber Tape Reader and an analysis of the readings by a well-qualified naval architect and research engineer shows that a substantial external moment of force acted on the ship between the headings of 120–112 degrees between 1837 and 1838 (recorder times).

22. At approximately 1845, Pilot Hixon ordered the vessel's engines ahead, and with the assistance of the tugboat, which was made fast on the GULFSPRAY's starboard bow at 1842, maneuvered the vessel to anchor in Bal-

boa Basin. The anchor was dropped at about 1854. While at anchor, Captain Forrest caused the steering gear to be tested and no defects were found.

23. Later that evening, Pilot Louis M. Pascavage boarded the GULFSPRAY to take her to dock for bunkers. With the assistance of two Panama Canal Company tugs, one at the bow and one at the stern, Pilot Pascavage maneuvered the ship to dock #16 where it was docked starboard side to, without incident. Another check of the steering gear was conducted during this period, but again the results were negative.

24. On April 3, 1966 at about 0400 hours, after bunkering operations had been completed, Panama Canal Pilot Henry K. Johnstone boarded the GULF-SPRAY to take her to sea. The ship was turned into the channel with the assistance of two Panama Canal Company tugboats, one at the bow and one at the stern. Both tugs were let go in the area of the Thatcher Ferry Bridge.

25. As soon as the vessel was lined up in the channel and Pilot Johnstone had ordered the rudder put amidships, the GULFSPRAY sheered to the left. The vessel was then in the vicinity of Docks 4 and 6, and there was a strong ebb tide. Pilot Johnstone at first attributed the sheer to the effect of that current. After the GULFSPRAY had built up speed, however, and after the tugboats had been released, she continued to sheer to the left when the rudder was placed amidships. He discussed the excessive right rudder with Captain Forrest as the vessel continued down the four-mile Pacific Entrance channel of the Canal, during which time it was necessary to maintain right rudder, varying between 15 and 20 degrees, to keep GULFSPRAY on a steady course.

26. Pilot Johnstone was disembarked in the vicinity of buoys 1 and 2 at approximately 0503 and the GULFSPRAY thereafter departed the Sea Buoy at about 0512.

27. The GULFSPRAY subsequently returned to Canal Zone waters, anchoring in the Pacific Anchorage at approximately 1218 hours on April 3, 1966. On April 4, 1966, she was brought to Balboa and docked at Dock 15, where a Panama Canal Company diver conducted an underwater inspection of the GULF-SPRAY's rudder, rudder skeg, rudder stock, and after portion of the hull. He determined that the rudder was laying about 22 inches to the left of center with the helm amidships.

28. The proximate cause of the damage sustained by the GULFSPRAY when her rudder struck the bank turning from the southbound sailing line in the Balboa Reach, toward Balboa Basin, was Panama Canal Pilot Hixon's failure to exercise the degree of skill expected and required of a Panama Canal pilot under the circumstances.

29. After Pilot Johnstone was discharged at about 0503 on April 3, 1966, Captain Forrest prudently navigated the GULFSPRAY clear of inbound Canal traffic and swung the vessel around, testing the steering gear to determine the cause of the excessive right rudder. Upon operation of the automatic pilot, the vessel would not maintain her course and commenced a left turn, although the maximum amount of right rudder (10°) was applied. When the cause of the excessive right rudder could not be explained after thorough testing, Captain Forrest concluded that something was wrong outside the hull and returned to Canal Zone Waters for an underwater inspection. He was not aware that his vessel had been damaged in Canal Zone Waters and that the Panama Canal Company was responsible for the damage before he left in the morning of April 3, 1966.

CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and the subject matter of the action.

2. A pilot must exercise the degree of skill commonly possessed by others in the same employment and he is liable for damage caused by his failure

to exercise the diligence which others similarly situated would ordinarily have exercised. *See* Sociedad de Transportes Maritimos, S. A., v. Panama Canal Company, 163 F.Supp. 151, 156; affirmed Fifth Circuit, 272 F.2d 726. D.C.C.Z. (1958).

 3. The damage sustained by the GULFSPRAY was not caused by an error in judgment since there was nothing unusual such as a storm or other unexpected hazard that demanded summary judgment or sudden decision on the part of Pilot Hixon, but the proximate cause was his failure to exercise the degree of skill required. *See* Tankers and Tramps Corp. v. Tug J. T. McAllister, S.D.N.Y., 1964 AMC 2551.

4. The failure of the ship to make a safe transit and its striking of the bank, a stationary object, created an inference of negligence which was not rebutted by the evidence. George W. Rogers Construction Corp. v. United States, D.C.S.D.N.Y., 118 F.Supp. 927, 930; Sociedad de Transportes Maritimos, SA, v. Panama Canal Company, *supra*.

5. In the absence of showing some failure of the crew, unexpected defect in the ship, or natural hazard that could not be anticipated, the failure to use a tug in making the turn from the Pacific entrance channel into Balboa Harbor, swinging the vessel too fast and backing full astern for three minutes, was a failure to exercise the necessary skill in handling her and was negligence on the part of Pilot Hixon. General Petroleum of Calif. v. City of Los Angeles, 42 Cal. App. 591, 109 P.2d 754.

6. There was no occurrence which a prudent person would have known of the likelihood of damage which, in like prudence, was fairly attributable to the Panama Canal Company's employees prior to the vessels departure and a proper claim was made upon the GULF-SPRAY's return to Canal Zone Waters as soon as reasonably possible in compliance with 2 C.Z.C. 297, Gulf Oil Corporation v. Panama Canal Company, (1969) 5 Cir., 407 F.2d 24, 32.

7. The pilot was an employee of the defendant Panama Canal Company acting within the scope of his employment for defendant, who is liable for the damage sustained by plaintiff. 35 CFR 4.22, 4.27 (now 35 CFR 105.1, 105.6); 2 C.Z.C. 292.

8. An interlocutory decree shall be entered holding defendant liable to plaintiff for its damages, with interest, costs and disbursements. In the event an agreement as to the quantum of damage is not reached between plaintiff and defendant within 60 days from the entry of the decree, upon motion of either party, or upon order of this Court, a trial date will be set to hear the evidence on damages.