MARIBLANCA NAVEGACION, S. A., as owner of THE Steamship MARIPOSA, her engines, boilers, etc., Appellant,

v.

PANAMA CANAL COMPANY, Appellee.

No. 18625.

United States Court of Appeals
Fifth Circuit.

Jan. 18, 1962.

**730**

Edwin Longcope, Hill, Betts, Yamaoka, Freehill & Longcope, New York City, for appellant.

David J. Markun, Gen. Counsel, Theodore P. Daly, Asst. Gen. Counsel, Paul T. Dunn, Atty., Panama Canal Co., Balboa Heights, Canal Zone, for appellee.

Before HUTCHESON, RIVES, and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

This is the second of three appeals, argued the same day, involving an allision in the Panama Canal.[1]

The Mariblanca Navegacion, S. A., a Panamanian corporation, appeals from a final decree of the United States District Court for the District of the Canal Zone dismissing its libel against the Panama Canal Company. The damages were sustained when the steamer, Mariposa, struck the east bank of the Gaillard Cut, during a northbound transit of the canal while under compulsory pilotage of a Panama Canal Company pilot.[2] Here, as in the two companion cases, to prevail the appellant must show that the district court's finding of no pilot negligence was "clearly erroneous". McAllister v. United States, 1954, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20. We hold that it has failed to sustain this burden and affirm the decision below.

**I.**

The Mariposa is a single screw, steam turbine cargo vessel of Liberian registry, 6,113 gross tons, 3,524 net tons, 476 feet overall length, 60.7 feet beam, with an authorized fresh water draft of 26 feet, 5½ inches. The ship is powered by a main propulsion engine of the steam reciprocating type, capable of producing a speed of ten knots. It is fitted with a low pressure turbine unit able to increase the speed to twelve and a half knots by utilizing the exhaust of the reciprocating unit. The turbine unit is detachable and was not connected during the trip through the canal. The Mariposa is equipped with an electric steering gear, operated by a wheel on the bridge. At the time of the accident the ship was traveling from Vancouver, British Columbia to Durban, Africa with a full cargo of timber.

Julius F. Dietz,[3] a licensed Panama Canal pilot for four years, was assigned to take the Mariposa through the canal. He boarded the ship at Balboa Roads about 9:30 in the morning of June 19, 1955, and began the transit which proceeded uneventfully to the Gaillard Cut. Shortly after entering the Cut, the Mariposa passed the Yaque port to port without difficulty at a point where the channel is 300 feet wide. However, in Culebra Reach, while awaiting the approach of the Eleni D., the pilot remarked to the master that the Mariposa was not handling then as well as she had been handling. Several ship lengths before the 20-degree left turn from the Culebra Reach into the Empire Reach the Mariposa passed the southbound Eleni D., a

1. See The Andros Shipping Co., Ltd. v. Panama Canal Company (The Andros Venture), 1962, 5 Cir., 298 F.2d 720, n. 1.

2. Federal regulations require vessels passing through the Canal to have a Panama Canal pilot aboard. 35 C.F.R. § 4.22 (1953). "The pilot assigned to a vessel shall have control of the navigation and movement of the vessel." 35 C.F.R. § 4.27 (1953). The Canal Company is liable for injuries to vessels caused by the negligence or fault of its officers or employees acting within the scope of their employment. 2 Canal Zone Code, § 10 (b), as amended 64 Stat. 1039.

3. Dietz is the same Dietz who was the pilot of the Aurora Borealis. Prior to the accident to the Mariposa, however, he had conned some 500 vessels through the Panama Canal.

vessel slightly larger than the Yaque. The ships passed port to port near Coal Hoist Bend, the most advantageous point for passing in the Gaillard Cut, for there the channel is 500 feet wide, its greatest width in the Cut. The trial judge found that the meeting and passing "was in all respects normal". Shortly after the bow of the Mariposa passed the stern of the Eleni D., Dietz had difficulty in turning the Mariposa to the left to make the bend in the channel. He had expected that the natural hydrodynamic forces created by the passing and by the position of the Mariposa to the right of the channel's center would swing the vessel to port, but instead the ship continued to move directly ahead toward the right bank. The pilot put the rudder gradually to the left without results. He then ordered the rudder to full left and increased the engine speed to half ahead. The ship broke to the left. Dietz shifted the rudder to full right, anticipating the heavy movement that would develop to the left, and further increased the speed of the engine. When the sheer to the left was broken, Dietz ordered the rudder shifted back to hard left to guard against the anticipated counter-sheer to the right and jingled to the engine room for emergency full ahead to increase the rudder's effectiveness. The ship headed toward the right bank, however, unaffected by the preventive efforts. Pilot Dietz realized that he could not break the ship's heading in time to prevent striking the bank. He ordered the port anchor to be dropped and the engine cut off. The port anchor hung in the hawse pipe, however. Dietz then ordered the starboard anchor dropped and the engine put in reverse. Moments later the vessel hit the bank at a speed of four to five knots.

The district court absolved the pilot of negligence and, going further than was necessary to the decision, ruled: "[T]he evidence adduced at trial establishes that the accident was probably caused by a failure of the vessel's steering mechanism and a failure of the ves-

sel's personnel to execute promptly the orders of the Pilot to the engines and anchors. In the circumstances, the doctrine of res ipsa loquitur could not aid libelant's case even if it be assumed that it might otherwise be applicable."

## II.

■ The appellant makes two specific contentions of pilot negligence: (1) that Pilot Dietz was negligent in exposing the Mariposa to the dangerous hydrodynamic forces of bank suction and ship interaction by attempting to pass the Eleni D. on a bend;[4] (2) that the pilot not only needlessly subjected the vessel to bank suction, but "recklessly" attempted to employ bank suction and intership action to swing the ship to the left so as to make the bend in the channel, thereby unleashing natural forces the vessel was powerless to overcome.

To support its first contention Mariblanca Navegacion relies solely on the fact that Dietz, as a Panama Canal pilot, knew that potentially dangerous forces of bank suction and ship interaction would affect the course of the ship if he moved it out of the channel center to pass another ship. The mere existence of this danger does not by itself, however, demonstrate that it was negligent for Dietz to attempt the passing, any more than the presence of slippery spots on a highway caused by rain or ice would render it automatically negligent for a motorist to drive over the road. A vessel experiences bank suction every time it is required to leave the centerline and come close to the bank of a narrow channel in order to pass another vessel or to make a bend. Here, as in any other case of alleged negligence, the court must balance the likelihood of accident, the severity of the foreseeable injury, and the cost of avoiding the risk. The appellant has failed to show that a consideration of these three factors leads to the conclusions that Dietz was negligent in assuming this risk. It has not presented any evidence as to the likelihood of accident or the cost of avoiding

4. See the discussion of bank suction in The Andros Shipping Co., Ltd. v. The

Panama Canal Company and Empresa del Petroleo, 1962, 5 Cir., 298 F.2d 720.

the risk; and it has not produced a single witness to criticize Dietz's attempt to make the passing that gave rise to the accident. Whenever two ships are traveling in the canal in opposite directions it will be necessary for them to pass somewhere. Here, the passage was effected not at the bend but near the bend in one of the widest portions of the Gaillard Cut. The Board of Local Inspectors made no reference in its opinion to the area of passing as involved in any way with the accident. Pilot Rubelli, who was conning the Eleni D. testified that there was nothing unusual or abnormal about the meeting and passing, and that it took place at "the most advantageous meeting place". The Pilots' Handbook, a training manual of the Panama Canal Company, explains these hydrodynamic phenomena and describes precautions to take to avoid losing control of the ship. In the absence of contrary evidence we may assume that adherence to the manual's instructions reduces the danger to a minimum and that ship passings may be made safely as a matter of course. We know that just prior to the accident the Mariposa completed a successful passing in a narrower portion of the channel.

The Mariblanca Navegacion's second contention, that Dietz was at fault in seeking to employ ship interaction and bank suction to assist the Mariposa in making the turn, is equally untenable. The appellant bases its contention on the fact that "he could only presume as to [the] effect of these forces." The short answer is that he *had* to take account of these forces in guiding the direction of the ship. The evidence indicates that a pilot must estimate the effect of bank suction and ship interaction and then utilize the forces or compensate for them. Three forces (bank suction, ship interaction, and some left rudder) tended to turn the vessel into Empire Reach. Reliance on these forces was not a matter of waiting for someone or something else to produce action the pilot should have brought about himself; from his experience he judged that the forces caused by his ship's movement and posi-

tion in the channel would, as an inescapable fact, turn the ship to the left. The training manual and the expert testimony both indicate that forces in that direction should have been anticipated. If the pilot had disregarded these foreseeable forces and steered the ship as though it were in clear water, he would have created a serious danger of over-correction. There can, therefore, be no objection to the pilot's conduct in influencing his rudder and engine orders by his estimate as to the extent of bank suction and ship interaction that would act upon the ship as it passed the Eleni D. To have done otherwise would have been blind folly.

The standard of care is that of a reasonably prudent pilot—an expert. Considering the substantial expert testimony exonerating the pilot of blame and the relative paucity of expert testimony to the contrary, we cannot say that the district court was "clearly erroneous" in finding the pilot free of negligence.

The appellant has made no criticism of the steps taken by Dietz to regain control of the ship and prevent an accident after it initially broke free from his control, and the record indicates that no fault could be found with his subsequent efforts. The appellant does, however, attack numerous findings of the trial judge that the accident arose from the fault of the ship and its crew. The trial judge found that a temporary failure of the steering gear caused the erratic behavior of the Mariposa as it completed passing the Eleni D., that the engine room did not deliver maximum power when ordered to do so by the pilot, that the Chief Engineer was not in a position where he could properly supervise the operation of the vessel's engine, that the Engine Room Bell Book contained numerous erasures and alterations making it impossible for the court to determine what the original entries had been, and that there had been a failure of the ship promptly and properly to drop the port anchor when the pilot ordered. The evidence on these questions is conflicting. The findings, however, while pertinent to establish the cause of the accident, are

not necessary to the judgment in this case. There is no burden on the Panama Canal Company to show the cause of the accident. The burden is on the libelant to prove that the cause was the pilot's negligence. As the libelant now recognizes, it cannot rely (as, in part, it did at the trial of this case) on the doctrine of *res ipsa loquitur* to perform this function for it. The Nonsuco, Victorias Milling Co. v. Panama Canal Company, 5 Cir., 1959, 272 F.2d 716; The Aurora Borealis, Panama Canal Company v. Sociedad de Transportes Maritimos, S. A., 5 Cir., 1959, 272 F.2d 716. It must rely on affirmative evidence of pilot negligence.

The Court has considered all of the issues the appellant has raised, whether or not these are discussed in this opinion.

The judgment is

Affirmed.