**WESTFAL–LARSEN & COMPANY, A/S,**
**Plaintiff,**

v.

**PANAMA CANAL COMPANY,**
**Defendant.**

**Civ. No. 7117.**

District Court, Canal Zone,
Balboa Division.

Feb. 21, 1973.

DeCastro & Robles, Balboa, Canal Zone, for plaintiff.

Dwight A. McKabney, John L. Haines, Jr., and Earl R. McMillin, Balboa Heights, Canal Zone, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CROWE, District Judge.

### FINDINGS OF FACT

1. Defendant, Panama Canal Company, was at all times mentioned in the complaint and answer, and still is, a corporate agency and instrumentality of the United States of America. The charter provisions of the Panama Canal Company appear in §§ 61 through 75 and 121 through 123 of Title 2, Canal Zone Code, 76A Stat. 8–15.

2. Plaintiff, Westfal-Larsen & Company A/S, was at all times mentioned in the complaint and answer the owner of the tanker AUSTANGER, a Norwegian-flag, steel-hulled, single screw vessel 559'–11" in length and 71'–11" in beam with Identity No. 6411079 and radio call letters JXYY.

3. On February 7, 1968 the AUSTANGER was boarded by Panama Canal Pilot Evan G. Evans, Jr. at 1710 hours in the Pacific Anchorage of the Panama Canal. Pilot Evans was assigned to the ship in accordance with the provisions of Title 35, Code of Federal Regulations, §§ 105.1 and 105.6, to take the vessel through the Canal northbound. Pilot Evans was a fully qualified Panama Canal pilot having served as a pilot for 15 years and 3 months and in addition was the holder of a master's license, ocean-going, issued by the United States Coast Guard.

4. At the commencement of the transit, the salt water draft of AUSTANGER was 17'–06" forward, 23'–06" aft and 20'–06" mean. Immeditaely upon boarding the vessel, Pilot Evans, in accordance with Title 35, Code of Federal Regulations, § 103.4 and Marine Director's Memorandum 6–66, instructed the Chief Mate of AUSTANGER, Ivar Ramsvik, to ballast the vessel so that her forward draft would be 20'–00". Following the accident, the fresh water draft was found to be 17'–11" forward, 23'–09" aft and 20'–10" mean. This increase in draft of the vessel was a result of the ship passing from salt water to fresh water and was not a result of ballasting. Furthermore, this increase in draft was not sufficient to comply with Pilot Evans' order.

5. Statement of the admitted facts material to the case, agreed to by counsel and contained in the Pre-Trial Order, is as follows:

"The M/S AUSTANGER, a Norwegian flag, steel hulled, single screw, motor tanker, 559'–11" in length and 71'–11" in beam, Identity No. 6411079, radio call letters JXYY was boarded by Pilot Evan G. Evans, Jr. and Pilot-in-Training Ray V. Hall in the Pacific Anchorage of the Panama Canal at 1710 hours on February 7, 1968. Pilot Evans was assigned in accordance with the provisions of Title 35, Code of Federal Regulations, Sections 105.1 and 105.6 to take the vessel through the Canal.

"At the commencement of the transit, the salt water draft of the AUSTANGER was 16'–00" forward, 23'–06" aft, 19'–09" mean. (In spite of the agreement by counsel, it was stipulated at the inception of the trial that the proof would establish the draft, and it was determined to be 17'–06" forward instead of 16'–00" and the mean was established to be 20'–06" instead of 19'–09".) Immediately after boarding the vessel, Pilot Evans, in accordance with Title 35, Code of Federal Regulations, § 103.4 and Marine Director's Memorandum 6–66, instructed the chief mate of the AUSTANGER, Ivar Ramsvik, to ballast the vessel so that her forward draft would be 20'–00". Following the accident the fresh water draft was found to be 17'–11" forward, 23'–09" aft, 20'–10" mean.

"The AUSTANGER departed the Pacific Anchorage at 1810 hours and proceeded northbound. The vessel entered the main ship channel at 1816 hours and passed Balboa at 1845 hours.

"In Balboa Reach, Pilot Evans ordered the main engine of the AUSTANGER slow astern. The vessel reached 60 revolutions per minute and the bow of the AUSTANGER canted to starboard as her stern went to port.

"At approximately 1950 hours the AUSTANGER arrived at the east lane of Miraflores Locks without incident and her lockage proceeded at 3 miles per hour. Leaving Miraflores Locks, Pilot Evans had the towing locomotives tow the ship at 3 miles per hour until the number one locomotive on the sidewall reached the knuckle at which time Pilot Evans ordered the towing locomotive wires cast off and the vessel's main engine half ahead.

"No bridge bell book was maintained aboard the AUSTANGER even though Title 35, Code of Federal Regulations, § 103.32 obliged the ship to keep a bridge bell book. The engine room bell book showed a half ahead order at 2033 hours.

"When the stern of the AUSTANGER cleared the wingwall knuckle, Pilot Evans ordered the main engine from half ahead to slow ahead. The control house at Miraflores Locks recorded the time the vessel's stern clear the lock at 2035 hours. The engine room bell book of the AUSTANGER recorded a slow ahead at 2035 hours. Pilot Evans, however, using his wrist watch, noted that the time of clearing Miraflores Locks was 2030 hours. The bridge log of the AUSTANGER contained the entry "2030 Out of Lock No. 2, slow speed."

"What order to the main engine followed the slow ahead recorded in the engine bell book as having been given at 2035 hours is a matter in dispute between the parties. The Panama Canal Company contends that when the stern of the AUSTANGER cleared the softnose at the north end of Miraflores, Pilot Evans ordered the main engine stopped. Westfal-Larsen & Company A/S contends that the engine of the AUSTANGER was not ordered stopped and that the vessel continued across Miraflores Lake at slow ahead.

"As the AUSTANGER passed buoy M–8, Pilot Evans estimated the vessel's speed was about 4 knots. The vessel proceeded northbound past buoy M–8 and Pilot Evans began his maneuvers to enter the east lane of Pedro Miguel Locks.

"In order to reduce speed to less than 3 knots, Pilot Evans prepared to back the main engine of the AUSTANGER as he approached Pedro Miguel Locks. Pilot Evans anticipated that when the vessel's main engine was ordered astern, the bow of the AUSTANGER would cant to starboard as the stern went to port, as it had when Pilot Evans put the main engine astern in Balboa Reach.

"To counteract the expected canting of the bow to starboard, Pilot Evans ordered 10° port rudder. As the bow of the vessel began to swing to port, Pilot Evans ordered the rudder midship and the main engine half astern. This order was recorded in the engine bell book as having been given at 2042 hours. The main engine going half astern did not have any effect on the vessel's heading; the bow of the AUSTANGER continued to port. Pilot Evans ordered the main engine full astern. This order was recorded in the engine bell book at 2042½ hours. At 2043, according to the vessel's engine room bell book, the main engine was put emergency full astern. This order for emergency full astern was given by the master of the vessel, Whilhelm Heggo. At the same moment that the emergency full astern was rung, Pilot Evans ordered the starboard anchor dropped.

"The stem of the AUSTANGER struck the south softnose at Pedro Miguel, damaging the ship and the softnose. Pilot Evans noted the time of allision, using his wrist watch, as 2044 hours. The bridge log of the AUSTANGER con-

tained the entry "2045 (2044) The bow touched on the pier." The engineers on the vessel noted the time of allision as between 2043 hours and 2044 hours. The control house at Pedro Miguel, using a clock in the Pedro Miguel control house, recorded the time of striking as 2043 hours. The speed of the vessel at the time of contact was estimated by the master of the AUSTANGER to have been 2 to 3 knots and by Pilot Evans to have been less than ½ knot.

"Following the allision, the AUSTANGER was maneuvered into the east lane of Pedro Miguel Locks. Pilot Evans continued in charge of the AUSTANGER following the allision. He left the ship in Gatun Lake Anchorage."

6. From the above recitation of events agreed to by the parties, there is doubt as to just what time the stern of the AUSTANGER cleared the chain at the north end of Miraflores Locks. It may have been 2035 or it may have been 2030.

The Board of Local Inspectors found that 2035 was correct, but this would have the ship achieve an average or "calculated speed" of 7.1 knots across the lake and the surrounding facts do not support such a speed. To maintain such a high average, higher peak speeds would have had to be reached as she was only going 3 knots at the time of leaving the Miraflores chain and 3 knots, or less, at the time of the striking of the "softnose" at Pedro Miguel. Neither Captain Evans' testimony of the commands given nor Captain Heggo's testimony nor the ship's log reflect a higher speed than 7 knots at any time in the voyage and the average was therefore considerably less.

7. The speeds of the vessel were: dead slow, 45 RPM, 5 knots; slow, 60 RPM, 7 knots; half ahead, 70 RPM, 8 to 9 knots, and full, 95 RPM, 12 knots.

8. The actual distance traversed from the chain in Miraflores Locks to the "softnose" in the Pedro Miguel Locks was 6,143 feet.

9. The wind blowing on the ship was from slightly north of northwest and was at a velocity of between 4 and 5 miles an hour at 8:40 p. m. (2040), and it was constant with no gusts. Although it was night time, visibility was excellent.

10. The "spill" from the empty Pedro Miguel Locks began at about 2030 and ended at about 2038. A spill would end in about 8 minutes and there would have been a surge around the "softnose" during the spill. The effect of the spill would not be felt out in the lake and the surge would have ended prior to the AUSTANGER's arrival to the vicinity of the "softnose", so her movement would not have been affected by any current emanating from the spill.

11. A hearing was had before the Board of Local Inspectors, which was convened in the Board Room of the Port Captain, Cristobal, at 0923 hours, February 9, 1968, to "conduct an inquiry into the circumstances surrounding the striking of the softnose, south end, of Pedro Miguel Locks by the port bow and stem of the MS AUSTANGER, at approximately 2043 hours while making its approach to the east side of the locks during northbound transit of the Panama Canal on February 7, 1968."

The Board of Local Inspectors was composed of Captain A. L. Gallin, Chairman, Captain E. B. Rainier and Captain R. C. Sergeant, all men of vast maritime experience both at sea and in connection with the operation of the Panama Canal.

12. The Board of Local Inspectors made Findings of Fact and rendered an Opinion, and the Opinion is as follows:

"1. That the proximate cause of the accident was the excessive speed on the vessel when it was approaching the south end of Pedro Miguel Locks, which necessitated an emergency full astern to which the vessel did not respond as it would normally be expected of a conventional single screw vessel.

"2. That there was fault on the part of the pilot for failure to take timely and proper action to get the headway off the vessel prior to the arrival at the south end of Pedro Miguel Locks.

"3. That there was fault on the part of the Master in that no bridge bell book is kept on the bridge, as required by Title 35, Section 103.32 CFR.

"4. That there was no fault on the part of the vessel or any member of the crew.

"5. That there was no fault on the part of any other Panama Canal employee."

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and the subject matter of the action.

■ 2. This action is based upon the provisions of 2 C.Z.C. § 292, 76A Stat. 23. In such actions there is no burden upon the Panama Canal company to show the cause of the accident. [Mariblanca Navegacion, S. A. v. Panama Canal Company, 298 F.2d 729 (5th Cir. 1962)]. The burden is upon plaintiff to come forward with the evidence showing that the accident was attributable to negligence on the part of the Panama Canal Company. [Andros Shipping Co. v. Panama Canal Company, 184 F. Supp. 246 (D.C.Z.1960) aff'd 298 F.2d 720 (5th Cir. 1962) ; *Mariblanca, supra;* Louis Dreyfus & Cie. v. Panama Canal Company, 298 F.2d 733 (5th Cir. 1962)].

■ 3. Pilot Evans was an employee of the Panama Canal Company acting within the scope of his employment for defendant. As a duly qualified Panama Canal Company pilot, he owed to plaintiff his best care, skill and judgment and that degree of care and skill must be such as is commonly possessed by others in his profession. [*Andros Shipping, supra*]

■ 4. The Master of the vessel committed a statutory fault in failing to keep a contemporaneous record of engine orders on the bridge (bell book) as required by Title 35, Code of Federal Regulations, § 103.32. The statutory fault did not contribute to the causing of the allision.

■ 5. The failure of the Chief Mate to ballast the vessel did not contribute to the striking of the wall by the ship.

6. The proof relative to the failure of the response of the engineers to the pilot's astern orders is not convincing. Previous backing orders by the pilot in Balboa Reach had been followed and the vessel reacted as expected and there is no showing of failure on the part of the engineering crew to obey the orders.

7. The Board of Local Inspectors found that the accident was caused by the "excessive speed of the vessel when it was approaching the south end" of the locks and that the pilot failed "to take timely and proper action to get the headway off the vessel prior to the arrival at the south end." The Board further found that the excessive speed necessitated an "emergency full astern" and that the vessel failed to respond to this emergency order as "it would normally be expected."

■ This Court has given great credence and weight to the findings of the Boards in the past although it has not been joined whole heartedly in this viewpoint by the Court of Appeals. See Luckenbach Steamship Co. v. Panama Canal Co., (D.C.) 236 F.Supp. 866, 380 F.2d 31 (5 Cir. 1967) ; Afran Transport Co. v. S/S Transcolorado, (D.C.) 321 F. Supp. 546, 458 F.2d 164 (5 Cir. 1972). The men that formed the Board in this case are seamen of great expertise, as was attested to by counsel for the defense in oral argument, and have great familiarity with the problems of Canal passages. Their opinion unless shown to be biased, which was formulated immediately after the accident and after a hearing of live witnesses, which included the principals, cannot be lightly cast aside.

What is the opinion of the Board? It is that there was fault on the part of both parties. Defendant's pilot failed to take timely and proper action to slow down the vessel and plaintiff's ship did

not respond normally when the emergency arose.

 This Court is content in the case to adopt the reasoning of the Board of Local Inspectors and finds that the allision was due to the negligence of defendant's employee, acting in behalf of the defendant, and the fault of the vessel for failure to respond when the emergency arose. The damages are not proportioned in accordance with 4 C.Z.C. § 1357 and this question is left open for further hearing.