**F. LAEISZ, Plaintiff,**

v.

**PANAMA CANAL COMPANY, Defendant.**

**Civ. No. 3222.**

District Court, Canal Zone, Division Cristobal.

April 1, 1974.

E. J. Berger, Cristobal, Canal Zone, for plaintiff.

Dwight A. McKabney [General Counsel], John L. Haines, Jr., Earl R. McMillin, Balboa Heights, Canal Zone, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CROWE, District Judge.

This is a matter in admiralty begun by filing a Complaint in Personam on March 13, 1972 in the Cristobal Division of this court.

The first three findings are taken verbatim from the Pretrial Order.

1. This action arises from the grounding of the motor vessel PUNA in the vicinity of buoy #70, Mamei Curve, in the Panama Canal, at approximately

2230 hours on March 16, 1969, during the vessel's northbound transit of the waterway. The cause of the accident was the application of port rudder to the vessel when her position in the channel required starboard rudder. Plaintiff contends that this port rudder was ordered by the Panama Canal pilot, in charge of the navigation and movement of the PUNA. Defendant contends that the pilot gave the correct—i. e., starboard—rudder order but the same was improperly executed by the PUNA's quartermaster, who put the helm to port.

2. Captain J. A. Long was the Panama Canal pilot assigned to the PUNA on March 16, 1969. He was so assigned pursuant to 35 CFR 105.1 and was, at all times material hereto, in charge of her navigation and movement. Captain Long was, and still is, an employee of defendant Panama Canal Company. (Since the preparation of the pretrial order it has been learned that Captain Long is no longer employed by defendant.)

At all times material hereto, the Panama Canal Company was, and still is, a wholly-owned corporate agency of the Government of the United States, incorporated by the Panama Canal Company Act of June 29, 1948 (c. 706, sec. 2, 62 Stat. 1076), as amended by the Act of September 26, 1950 (c. 1049, sec. 5 et seq., 64 Stat. 1041). The incorporation statute now is contained in Title 2, Canal Zone Code, sections 61–75 and 121–123, 76A Stat. 8–15. The Panama Canal Company was, and still is, authorized by statute to maintain and operate the Panama Canal and its approaches, including the area in which the said grounding occurred, and to maintain and operate facilities and appurtenances necessary and appropriate for the accomplishment of the purposes of its corporate charter and to take such action as is necessary and appropriate to carry out the powers specifically conferred upon it. 2 C.Z.C. § 66(a)(1), (4) and (7), 76A Stat. 11. The Panama Canal Company is expressly authorized to sue and be sued in its own name. 2 C.Z.C. § 65(a)(3), 76A Stat. 11. The liability of the Panama Canal Company in this cause, if any be found, is governed by the provisions of 2 C.Z.C. §§ 292, 293, 76A Stat. 23.

3. The motor vessel PUNA is a single screw, cargo vessel of German registry with a gross tonnage of 5,434.71 and a net tonnage of 2,896.94. She is of an overall length of 465.26 feet and a beam of 59.15 feet. Her mean authorized tropical fresh water draft is 24 feet, 9⅞ inches. The PUNA was built in Hamburg, Germany by Deutsche Werft, A. G. At all times material hereto, the PUNA was owned and operated by plaintiff F. Laeisz, the present address of which is Hamburg, Germany. On the day of the accident the vessel was drawing 19 feet forward and 22.25 feet aft, and was bound from Puerto Limon to Hamburg with Captain Heinz Paulsen as her master.

4. Pilot J. A. Long had been a Panama Canal pilot for 17 months and was the holder of an unlimited master's license and a Panama Canal license to pilot ships limited to 526 feet in length. The master of the PUNA, Captain Heinz Paulsen, and the third officer, Martin Reimer, were licensed officers who had wide sea experience and had passed through the Panama Canal on numerous occasions. Johannes Petrolino, the quartermaster, was an able-bodied seaman of Germany and had traversed the Canal some 30 times, sometimes as quartermaster on the wheel, and other times not. Ulrich Dobzin was the ordinary seaman on watch.

5. On March 16, 1969, the PUNA began a northbound transit of the Panama Canal. The transit was normal and without incident until the PUNA was in Gamboa Reach. Upon entering that reach Pilot Long gave orders to line the vessel up on the green northbound range lights and directed the quartermaster to "steady" on those ranges. As the vessel neared the northern end of the reach, Pilot Long noticed that the vessel was no longer aligned with the ranges but instead was getting close to the red buoys on the wrong side of the channel.

He informed the third mate (who was on watch on the bridge) of this fact and then gave rudder orders until the ship was again "on the ranges". It appeared from this incident that the helmsman, Johannes Petrolino, was confused and unable to properly steer the vessel toward the range lights. Pilot Long then instructed the third mate to tell Petrolino in German to disregard the lights and to steer a compass course.

6. The PUNA then rounded into Mamei Curve. Her engines were on full ahead (maneuvering) and her speed was estimated by both the pilot and the master to be about 15 knots, and was within the prescribed speed limit for that area of the Canal. See 35 CFR 111.162(a). The pilot was at that time standing on the starboard wing of the bridge because visibility forward was better from that position than it was from the wheelhouse. The master was also on the starboard bridge wing, and he was talking to a woman passenger who had descended from the upper bridge where passengers were permitted and was enroute to the area below.

7. When the PUNA was between buoys 75 and 73, Pilot Long, in accordance with his usual practice, determined to begin the starboard turn into San Pablo Reach.

8. At this point the confusion begins. Pilot Long testifies that speaking in English he ordered the rudder put "starboard 10". Shortly thereafter he noticed the ship begin to swing not to starboard but to port and ran immediately into the wheelhouse ' and looked at the rudder angle indicator. He says that the wheel had been put to port rather than to starboard and he says he ordered again "starboard 10". Recalling the prior incident in Gamboa Reach involving helmsman Petrolino, where there was a misunderstanding, Pilot Long testified that he called to the mate on watch and said, "He has port 10; I want starboard 10." The pilot ran back to the bridge wing to view the vessel's heading and swing, leaving the mate talking to the helmsman in Ger-

man. Pilot Long saw that the vessel was continuing to swing to port at an even faster rate and he raced back into the wheelhouse and observed that the rudder had been placed hard to port. He testified that he then yelled to the mate and helmsman, "I don't want hard to port, I said starboard 10", and in an effort to check the vessel's accelerating swing to port he ordered "hard starboard" and he stayed there to make sure the vessel went to starboard. By this time the vessel was west of the center line and nearing the west prism line of the channel and, although the vessel was beginning to swing back to starboard, Pilot Long realized the vessel could not clear the west bank and he ordered the vessel "full astern". In spite of the "full astern" order, approximately one minute later the PUNA grounded outside of the channel in close proximity to buoy 70.

9. The crew of the PUNA tell a different story. The master testified that he noticed the vessel start to swing to port and he followed the pilot into the wheelhouse and heard the pilot order "more port". The master realized that the order should have been to starboard, because he knew that the vessel had to make a right turn. The third officer testified he heard the pilot order "5 degrees port", then "10 degrees port", and then he rushed into the wheelhouse and ordered "hard to starboard". He said that he did not know when the vessel was supposed to make a right turn at this time and assumed the port orders were correct. The quartermaster, Petrolino, states that he was ordered by the pilot, "5 degrees port", then "10 degrees port", then "hard to port", and later in the confusion, "hard to starboard". The ordinary seaman, Dobzin, who was standing lookout on the starboard wing of the bridge, testified that he heard the pilot give the order "port 5", and a little while later, "hard to port", and then, "hard to starboard".

10. The vessel was equipped with rudder angle and engine direction indicators which were in working order at

the time of the grounding, and all of her propulsion machinery and auxiliaries were in good working order. The pilot had no criticism to make as to the manner in which his orders were carried out with the exception of the incident in the Gamboa Reach and, of course, the commands which led to the grounding which resulted in this action.

11. The parties stipulated as to the authenticity of the report of the official investigation conducted on March 17, 1969 by the Canal Zone Government Board of Local Inspectors into the circumstances surrounding the grounding of the vessel, including the testimony of witnesses appearing before the Board, the exhibits annexed to the report, and the Findings of Fact and Opinion of the Board. In addition to this material, the case was submitted upon the pleadings and arguments of counsel and the Pilots Handbook of 1967.

## CONCLUSIONS OF LAW

■ 1. The Panama Canal Company is not the insurer of the safety of vessels transiting the waterway and a vessel-accident claimant against the agency must affirmatively prove that the accident in question was due to the negligence of the Company's employees before he is entitled to recover. Andros Shipping Co. v. Panama Canal Company, 298 F.2d 720, 726 (5th Cir. 1962); Mariblanca Navegacion, S. A. v. Panama Canal Company, 298 F.2d 729, 733 (5th Cir. 1962); Dreyfus & Cie v. Panama Canal Company, 298 F.2d 733, 739 (5th Cir. 1962).

2. This Court has been saddled with the difficult task of determining fault on the part of one of the parties when it was not possible for the Board of Local Inspectors to make such a decision. The Board of Local Inspectors is made up of experienced pilots and seamen, who know all of the intricacies of navigating vessels through the Panama Canal, and when they are unable to come to a conclusion it is indeed difficult for a desk-bound judge to use precisely the same material that was submitted to them and arrive at a just and clear determination.

■ I feel from the facts developed in the proceedings before the Board and the law in the case that I must find against the Panama Canal Company. The pilot, under 35 CFR 105.6, was in charge of the "navigation and movement" of the vessel. This is mandatory and divests the master of much of his traditional authority and responsibility. The defendant and the pilot, therefore, are charged with a very high degree of care and should take every step to see that the pilot's commands are proper, understood, and executed. In this case, it was a German ship with German personnel on board, and while the captain and the third mate spoke some English, the helmsman did not, although he admitted to having understood the English commands relative to the wheel. The pilot knew that there was difficulty on the part of the helmsman, Petrolino, because of his experience earlier in Gamboa Reach when there was a misunderstanding.

The Pilots Handbook of 1967 of Panama Canal Company, in paragraph 6.20, directs the pilot, when giving orders to the wheelman, to look directly at him and give the order in a clear distinct voice, "emphasizing the order by hand gesture when suitable, and when possible keeping the person or applicable indicator under your observation until you are sure the order is understood and correctly carried out." In this instance, Pilot Long states he gave three commands, "ten degrees", "ten degrees", and "hard". He says he gave then all to starboard, and the plaintiff's witnesses claim the commands were given to port. He was out on the bridge when he saw the ship turning to port; he rushed in and attempted to change the ship's direction by giving the command "hard to starboard" and then "reverse engines", but it was too late; the damage had been done and the ship went aground. It may have been that he was confused and actually did give the commands to port, although this does not

seem likely. It is probable that the language barrier created a misunderstanding. Whether it was the error of the pilot in giving the commands or whether it was a misunderstanding on the part of the helmsman, who interpreted the commands erroneously, I can not escape the conclusion that the pilot should have made sure the order was "understood and correctly carried out", and this he did not do until it was too late. At the last only did he stand directly by the helmsman and see that the wheel was put to starboard.

3. The parties stipulated in the Pretrial Order that the action would be tried on the question of liability separately from and prior to a trial on the issue of damages. The Clerk is therefore directed to prepare a judgment, finding for the plaintiff on the question of liability, together with its costs, and the case is continued for further hearing on the issue of damages.