**LUCKENBACH STEAMSHIP CO., Inc.,** as owner of the S. S. ROBERT LUCK-ENBACH and as bailee of the cargo laden thereon, Libelant,

v.

**PANAMA CANAL COMPANY,** a corporation, Respondent.

No. 4656.

District Court, Canal Zone Division, Balboa.

Jan. 11, 1965.

De Castro & Robles, Balboa, Canal Zone, Burlingham, Underwood, Barron, Wright & White, New York City, for libelant.

David J. Markun, Dwight McKabney, Jerry W. Mitchell, Walter T. Williams, Whitney E. Smith, Philip N. Smith, Office of Gen. Counsel, Balboa Heights, Canal Zone, for respondent.

CROWE, District Judge.

This is an action in personam by the Luckenbach Steamship Company, Inc. as owner of the S.S. Robert Luckenbach and as bailee of the cargo thereon to recover damages allegedly sustained as a result of the vessel's grounding in Gamboa Reach of the Panama Canal. The grounding occurred on the west side of the channel, "abreast and outboard" of Buoy No. 82, on March 24, 1955 during a northbound transit of the Canal.

During the transit a Panama Canal pilot was on board as required by Title 35, Code of Federal Regulations, section 4.22, as adopted by Order of the Secretary of the Army, Canal Zone, Order No. 30, January 6, 1953 (18 F.R. 280), (section 4.1 of the Rules and Regulations Governing Navigation of the Panama Canal and Adjacent Waters, 1952 Edition). The function and status of a pilot assigned to a vessel in Canal Zone waters are stated in Title 35 CFR, Sec. 4.27 (Sec. 4.6 of the Rules and Regulations * * *) as follows: "The pilot assigned to a vessel shall have control of the navigation and movement of such vessel."

Libelant alleges that as owner of the vessel and as bailee of her cargo it has been damaged for repairs, loss of use, general average sacrifices, losses and expenses, including $40,638.16 paid to respondent "under duress for the said re-

floating", in the amount of approximately $200,000.00 but it was stipulated in the pretrial conference order that the issue of liability as to the grounding was to be tried separately from and prior to the trial of the issue of damages so the only proof before the Court at the time of making these findings is as to liability.

## FINDINGS OF FACT

1. The S.S. Robert Luckenbach is a standard, single screw, steam turbine, C–3 cargo vessel, 492 feet long, 69.6 feet in beam and of 7,882 gross tons which at all relevant times was owned and operated under the United States flag by libelant, Luckenbach Steamship Company, Inc. The vessel is equipped with a rudder angle indicator located on the forward bulkhead of the pilot house, a clearly visible helm angle indicator located on top of the telemotor stand in the after part of the pilot house, and a course recorder. When proceeding in pilot waters, her propeller turns 20 rpm's at slow ahead, 40 rpm's at half ahead, and 60 rpm's at full ahead. Her mean authorized tropical fresh water draft was 30 feet 7 and 5/8 inches, and on March 24, 1955 she was heavily laden but not overloaded, with a fresh water draft in the Panama Canal of 29 feet 6 inches forward and 29 feet 11 inches aft. She was built in 1944 by the Western Pipe and Steel Company at San Francisco, California, and is steered by a Webster-Brinkley electrohydraulic steering gear which, when operating properly, enables her to steer exceptionally well, and she is capable of a rudder movement from mid-position to hard over right or left, or 35° either way, in 15 to 18 seconds.

2. On the evening of March 23, 1955 the S.S. Robert Luckenbach, on a voyage from Seattle, Washington to New York, anchored off the Pacific entrance to the Panama Canal to await transit. At 0727 on March 24, 1955 the Panama Canal pilot, Volkert F. Jacobs, boarded the vessel to navigate her through the Canal. Pilot Jacobs died before the trial but his testimony was taken by the Board of Local Inspectors of the Canal Zone Government at the hearing begun on March 28, 1955 on board the S.S. Robert Luckenbach at Gamboa Moorings and it was stipulated in the Pre Trial Order of this Court that his testimony was admissible in this trial.

Before leaving the anchorage the vessel's steering gear and navigational equipment were tested by the ship's officers and crew and found to be in good working order. The vessel weighed anchor and began a northbound transit of the Canal at 0734.

3. Pilot Jacobs was assigned by the respondent, Panama Canal Company, as the pilot for the transit and was in control of the navigation and movement of the vessel while proceeding through the Panama Canal. He was a qualified and experienced Panama Canal pilot, having been employed in such capacity by respondent since 1944. He had not piloted the S.S. Robert Luckenbach before but had piloted other vessels of the same class and design and was, or should have been, fully familiar with her maneuvering and navigational characteristics, including the speeds the vessel would make with her engines proceeding at slow, half, and full ahead maneuvering speeds.

4. The S.S. Robert Luckenbach handled normally and proceeded without incident from the Pacific anchorage along the Pacific Entrance Channel through the Miraflores and Pedro Miguel Locks. She departed Pedro Miguel Locks at 1115 hours and proceeded through the narrow Galliard Cut, which had a channel width of 300 feet in certain of its reaches. She cleared Galliard Cut at 1223 hours without any indication of steering gear difficulties. She made the transit from Pedro Miguel Locks to Gamboa in the normal average transit time scheduled for that part of the Canal. While passing Gamboa she was proceeding at half ahead, 40 rpm's; at this time, about 1233 hours, her master requested and received permission from the pilot to go to his office on the deck below the bridge and the pilot also permitted the chief mate and carpenter to be dismissed from the fo'c'sle head. These men were released

with the knowledge of the master and without his objection. The release of the chief mate and the carpenter was in accordance with standard practice or custom in the Canal once a vessel clears Galliard Cut and is in the vicinity of Gamboa.

5. Gamboa Reach is a straight section of the Canal about 2.7 miles long and 500 feet wide between the prism lines and with an average depth of 45 feet. Mamei Curve is located at the far end of Gamboa Reach for a northbound vessel entering the Reach, and is a blind curve around which a northbound vessel cannot see approaching southbound vessels.

6. Gamboa Reach has a northbound and a southbound sailing range, each of which is offset 100 feet from the center line of the channel. These ranges are established to keep transiting vessels in proper location and are followed and used when passing other vessels. They set a course that the helmsman uses to steer by and that the pilot uses to maintain a check on the vessel's position in the channel. Ordinarily a vessel, including a C-3 type vessel, is navigated as near the center line as possible unless there is oncoming traffic. If there is oncoming traffic the vessel is steadied on the appropriate northbound or southbound range.

7. On March 24, 1955, a dredge was working in Mamei Curve, out of sight of the vessels approaching along Gamboa Reach. The dredge was on the port side of the channel with relation to the northbound transiting S.S. Robert Luckenbach. The pilot and master were both aware of the location of the dredge.

8. Although there was no oncoming traffic the pilot kept the vessel on the northbound range after having passed a southbound vessel as the S.S. Robert Luckenbach entered Gamboa Reach.

9. Just before the master left the bridge, the engines of the S.S. Robert Luckenbach were put on full ahead maneuvering speed. This was done at 1233 hours in the vicinity of Beacon 93 at Gamboa and continued until 1240¼ hours during which time she built up to a speed of between 11.10 and 12.2 knots. The pilot should have known that 60 rpm's on this vessel would result in speed exceeding the 10 knots limit prescribed by Section 7.82 of 35 CFR 4.282 for vessels in Gamboa Reach.

10. The vessel continued on the northbound sailing when at 1240¼ hours and shortly after passing Beacon 87, the pilot reduced her speed to half ahead, 40 rpm's, to slow down for Mamei Curve. At about the same time the vessel developed a hard sheer to the left. He immediately called for right, then hard right rudder. He noticed that the vessel did not answer the rudder. The electric rudder angle indicator showed a 10 degree right rudder angle while the brass helm angle indicator located on the telemotor stand in front of the wheel showed hard right. There was no apparent response from the rudder. At 1240½ hours the pilot ordered slow ahead and then emergency full astern. The vessel continued the sheer across the channel. The pilot ordered the dropping of the port anchor at 1244 hours and engines half astern. At 1246 hours the vessel was solidly aground on the west side of the channel abreast and outboard of Buoy No. 82. At the time of the grounding there was no grinding or jarring from the hull, merely a gradual and complete stop. The maximum angle of the sheer was 20 degrees from the heading on the northbound range. The total time elapsed from the beginning of the sheer until the actual grounding was about two minutes.

11. The master and the chief officer were in the master's office on the deck below the bridge when emergency full astern was rung. The chief officer hurried forward on the fo'c'sle head. He met the officer-in-charge of the bridge watch on the fore deck and received the order to let go the port anchor, which he did immediately.

12. The master went immediately to the bridge after hearing the emergency full astern bell, arriving not less than 10 seconds after the bell. When he arrived on the bridge he went directly to

the pilot on the port wing and in passing through the wheelhouse noted that the rudder angle indicator showed approximately 20 degrees right rudder. At this time the vessel was close to being aground and her engines were going full astern.

Immediately following the grounding, the steering gear was tested by the ship's chief engineer and found to be in good working condition. The rudder swung from left to hard right without difficulty. The rudder was again tested a few hours later in the presence of several Panama Canal representatives and again nothing wrong was found.

13. The course recorder of the S.S. Robert Luckenbach establishes that the sheer was 20 degrees to the left and that two minutes elapsed from the beginning of the sheer until the vessel grounded. The course recorder time was not the same as the wheelhouse time and can not be accurately correlated with the positions of the vessel and the orders recorded in the bell book.

14. The S.S. Robert Luckenbach remained aground from shortly after 1240 hours on March 24, 1955 until she was refloated at 1335 hours on March 27, 1955. The area on each side of the vessel was dredged and a portion of her cargo and bunker oil was discharged before she was refloated. She was towed to the Gamboa moorings after refloating, where she was inspected for damage and the cargo and bunkers were reloaded. She departed Gamboa on March 28, 1955 at 1132 hours and continued her transit, completing it without further incident and taking departure from Cristobal at 1937 hours on March 28, 1955.

15. The helm and engine actions taken by the pilot before the sheer occurred were in all respects customary and proper. The vessel proceeded in a usual and normal manner along Gamboa Reach on the northbound sailing range, which was normal, standard practice for transiting ships while in Gamboa Reach. The actions taken by the pilot when the sheer to port developed were in all respects proper. The amount of rudder called for by the pilot was sufficient to check the sheer, if the rudder had responded in a normal manner. If her rudder had responded normally, she would have recovered from the sheer well within the available time and steadied on a safe northbound course through the Canal.

The S.S. Robert Luckenbach experienced sheering or tendencies to deviate from course during the transit by reason of bank suction, which is ever present in the restricted waters of the Panama Canal, but each time she responded to the helm except at the time of the grounding.

16. The S.S. Robert Luckenbach has a long history of steering gear failures dating from the first trip after she was taken over by Luckenbach Steamship Company, Inc. in 1949. Prior to 1954 she had several steering gear failures. On October 12, 1954, she suffered a steering gear failure in the Columbia River. This failure occurred subsequent to a satisfactory test of the gear before she got underway and just after she crossed the Columbia River Bar where her steering gear was heavily used. She suffered another steering gear failure while underway at sea on January 11, 1955, and another just five days before the accident on March 19, 1955. On October 20, 1955, she suffered a steering gear failure while entering Gatun Locks. Following this last mentioned failure, she departed Cristobal for sea. After taking departure and increasing her speed to full ahead, sea speed, her master, chief engineer and first assistant engineer conducted a highly unusual test of her steering gear.

17. Subsequently, on November 10, 1955, her steering gear was thoroughly tested, examined and checked by telemotor repair experts. Upon completing the inspection, the expert repairmen were unable to find any part of the main gear that was not in good working condition. They then called on the master and chief engineer to describe what had taken place at sea. After the master related the details of the failure, the telemotor repair experts concluded that the trouble

stemmed from the wheelhouse telemotor and advised removal of the by-pass valve. The by-pass valve was removed and opened in the vessel's machine shop by expert repairmen. Foreign matter was found in the automatic by-pass valve and the valve seats were scored. The experts determined that the oil in the telemotor system was dirty. They then disassembled the forward and aft telemotor, repacked, re-machined, purged and replenished the oil in the system, and then reassembled the telemotor mechanism.

18. The temporary failure of the steering gear is reasonably established by the evidence. Respondent also produced evidence affording a reasonable explanation of the probable cause of the temporary failure of the steering gear. This failure apparently occurred when the automatic by-pass valve in the wheelhouse telemotor was temporarily held open by foreign matter in the telemotor fluid which permitted a partial by-pass and prevented the transmission of a complete hard right order to the after telemotor. It is likely that when the helm was reversed the foreign matter was flushed through the valve by the flow of oil, thus removing the cause of the temporary failure.

19. Libelant has failed to produce any convincing evidence supporting its contention that it was not possible for the vessel's steering gear to temporarily fail and subsequently correct itself without being repaired. An apparently satisfactory test of the steering gear therefore does not preclude a prior or subsequent failure of the gear.

20. The engines of the S.S. Robert Luckenbach were put on full ahead maneuvering speed of 60 rpm's at Gamboa in the usual manner for vessels of her class when transiting northbound. She proceeded at that speed until shortly before commencement of her sudden sheer. The evidence is not clear as to what her actual speed through the water was at the time the sheer commenced. Regardless of the precise speed she was making, whether it was 10.0, 10.96 or 12.2 knots, as variously contended, the vessel would have had no difficulty in overcoming the sheer if the rudder had responded properly to the pilot's helm order. Her rudder power was such that had the rudder gone over to hard right as ordered, it would easily have overcome the turning moment induced by either bank suction or angular acceleration, or any combination of the two forces which may have existed. It is therefore clear that, regardless of the speed of the S.S. Robert Luckenbach through the water when the sheer commenced, her speed was not excessive and did not nor could it have contributed in any way to the grounding. As established by the expert testimony, additional speed, if any, over and above the established speed limit of 10 knots would only have served to assist in overcoming the sheer by providing greater rudder force.

21. Weather conditions played no part in this casualty. At the time and place of the accident, wind and current were negligible and visibility was excellent.

22. Libelant's allegation concerning the existence of a shoal within the prism line of the channel between Beacons 87 and 85 along the east side of the channel is not supported by the evidence. Respondent's surveys, conducted with electronic equipment, found only deep water within the prism lines. The same electronic surveys found the shoal area which has always existed and which is recorded on the charts of Gamboa Reach. The long-existing shoal, which the vessel's personnel apparently found, is located on the Beacon Line, 30 feet outside the prism line.

23. The Board of Local Inspectors, composed of three U. S. Navy Captains, convened on board the S.S. Robert Luckenbach on March 28, 1955 to investigate the circumstances surrounding the grounding. Their meeting occurred only four days after the grounding and the percipient witnesses, including the pilot who died before this trial, were present with other knowledgeable witnesses. Libelant and respondent were both repre-

sented by counsel who examined the witnesses.

The findings of that board are that all of the actions of the pilot were proper and that there was no negligence or fault on his part and that there was fault on the part of the vessel in that the steering gear was particularly slow in responding to the wheel.

24. The libelant sent notice of claim to the Panama Canal Company on August 7, 1955 and a formal detailed claim was presented on October 24, 1957. Unsuccessful settlement negotiations were followed by suit brought within the analogous three year limitation period provided in Title 5, Canal Zone Code, Section 42.

## CONCLUSIONS OF LAW

■ 1. This is a suit by the owner of the S.S. Robert Luckenbach, Luckenbach Steamship Co., Inc. under sec. 10 of Title 2 of the 1934 Canal Zone Code as amended June 13, 1940, ch. 358, § 1, 54 Stat. 387; Sept. 28, 1950, ch. 1049, § 3, 64 Stat. 1039, for damages sustained by that vessel when she grounded in Gamboa Reach on March 24, 1955, while being navigated by a Panama Canal pilot. Under the cited statute, the respondent is liable for injuries which a vessel sustains by reason of the negligence or fault of the respondent or its officers, agents, or employees acting within the scope of their employment and in the line of their duties in connection with the operation of the Canal. Victorias Milling Co. v. Panama Canal Company, 5 Cir., 272 F.2d 716, 718, 1960 A.M.C. 251, 253.

2. The Court has jurisdiction over the parties and the subject matter of this action.

■ 3. The respondent proved convincingly that every aspect of the control which it had over the vessel was exercised with due care prior to and during the sheer which resulted in the grounding and that the grounding was not caused by any fault of the Panama Canal Company or of its employees.

4. That the libelant failed to prove by a fair preponderance of evidence that the grounding of the S.S. Robert Luckenbach was caused by any negligence or fault of respondent or of any officer or employee of respondent in any of the several respects alleged by libelant. If any conclusion as to the cause of the accident is to be drawn from the evidence adduced at the trial, it is that the accident was proximately caused by a temporary failure of the vessel's steering gear.

■ 5. Great credence should be given to the findings of the Board of Local Inspectors all of whom were captains in the United States Navy at the time of the hearing and therefore men of high professional experience in maritime matters. This is especially true as the percipient witnesses were present and testified and libelant and respondent were represented by counsel and nine years have passed since the date of the grounding and the trial of the case at bar.

■■ 6. The speed of the S.S. Robert Luckenbach in violation of the rule limited the speed to 10 knots was not ths proximate cause of the injury and therefore is not a basis of liability. P. Dougherty Co. v. United States, 3 Cir., 207 F.2d 626; Crawford v. Indian Towing Co., 5 Cir., 240 F.2d 308.

■ 7. The libel is dismissed and the respondent shall recover of the libelant costs allowable under the laws of the United States and the Canal Zone.

8. The respondent is directed to prepare an order in accordance with these findings.